[Crim. No. 3948.  Second Dist., Div. One.  Apr. 30, 1946.]

THE PEOPLE, Respondent, v. ARTHUR RICHARDS, Appellant.

Frederic H. Vercoe, Public Defender, and William B. Neeley, Deputy Public Defender, for Appellant.

Robert W. Kenny, Attorney General, and Everett W. Mattoon and Carl S. Kegley, Deputies Attorney General, for Respondent.

WHITE, J.—In an information filed by the District Attorney of Los Angeles County, the defendant was accused in count I of the crime of robbery and in count II of the offense of assault by means of force likely to produce great bodily injury. After trial before a jury the defendant was found guilty of the crime of robbery, which was found to be of the first degree. He was acquitted of the charge contained in count II. His motion for a new trial was denied. From the judgment of conviction and from the order denying his motion for a new trial defendant prosecutes this appeal.

Viewing the evidence in the light most favorable to the prosecution, as we are required to do following a guilty verdict, we find in the record evidence that one Joseph Rosenfield was the owner of a junk and salvage business at 1023 South Alameda Street in the city of Los Angeles. His father, Morris Rosenfield, the victim herein, helped him at the salvage yard. The aforesaid business premises comprised a "front building" and a "rear building," between which a tent housed and protected assorted army tents and salvaged canvases. Projecting along and across the east end of the front building is a platform or dock six feet wide and three feet high, with an approach or ramp slanting down in an easterly direction to the ground at the southerly front portion thereof. At the extreme south of this dock there is a three-foot direct drop to the ground.

The defendant had worked for Joseph Rosenfield at the salvage yard over a period of time some two years before the date of the alleged offenses. He was known to both Joseph and Morris Rosenfield as Arthur Richards and was by them called "Richard." On February 27, 1945, the defendant was again employed at the salvage yard, and at the time of his employment he signed the "employee's withholding exemption certificate" giving the name "Leroy Dozier." Defendant testified that he used the latter name because of domestic trouble he was having with his wife, by reason of which he desired that she not know of his employment. No particular significance can be attached to the use of this alias because the record reflects that defendant was at all times known as "Richard" by both Joseph and Morris Rosenfield, and there was no evidence that this change of name was utilized in any way to deceive either of the Rosenfields.

At the conclusion of his day's work on February 27 the

defendant was paid his wages for that day. He returned to work on the following day, February 28. Some time during the early afternoon of February 28, Morris Rosenfield was waiting on a customer who was interested in purchasing some salvaged canvas in the tent on the junkyard premises, but the canvas there exhibited not being what the customer wanted, he, the elder Rosenfield and the defendant went back to the front building where there were some raincoats and other odd lots of junk. The customer purchased some canvas and the defendant assisted Rosenfield in cutting it.

At about 3:30 on the afternoon of February 28 Joseph Rosenfield found his father lying on the floor in the building on the front of the salvage lot. The father was unconscious, his pockets were pulled inside out, and his wallet was missing. The major injury suffered by the victim in the assault was a fracture at the base of his skull, although there were additional cuts and abrasions about his head and face.

At the trial Rosenfield Senior testified that he had difficulty recalling anything after being knocked down; that as a result of the injuries sustained by him he had difficulty remembering; that he saw double, and had headaches. However, he recalled that after paying $5.00 the aforesaid customer went out; that this was before the attack; that he put the money in his purse. He had no recollection of being struck and at no time did he identify the defendant as his assailant, nor did he testify actually that the defendant was present at the time of the assault. The witness also testified that the defendant inquired about his health, although, as we read the record, this inquiry was not made, as contended by respondent, ''after the customer went out,'' but was made on the morning of February 28. This witness also testified that near the scene of the assault there was a platform scale and scale weights; but we fail to see the applicability of the evidence with reference to scales to the issues in this case, because while the victim's son made no examination of the scale weights, Deputy Sheriff Hannon did, and failed to find anything about them to indicate that they had been used in connection with the assault.

On the day of the crime, Officers Hannon and Achenbach went to the junk yard, saw the scene of the crime, photographed the surroundings, and saw footprints stepping south from the platform in front of the building. Impressions, photographs and casts of the same were made. These footprints were on the ground stepping south from the platform

and were about 20 to 25 feet from the bloodspots. At the trial the defendant stipulated that the footprints were his.

The defendant was apprehended on March 8 at Imperial Boulevard and Bandera Street, a point approximately two miles from the junk yard here in question and about one-half block from his home. Upon being questioned by the officers, defendant denied knowing Mr. Rosenfield; and stated that on the day of the offense here in question he had been looking for work and was in downtown Los Angeles "with a friend looking for a job." In answer to the officer's question as to whether he had ever worked for the firm of J. Joseph Company, he said that he had "a couple of years prior to this time and he was not working for him the preceding week." It might here be noted that the Rosenfields operated their business under the name of "J. Joseph Company." On the day following his arrest a further conversation was had with the defendant at the Firestone Sheriff's substation, where he was told that the officers had photographs of his footprints, pictures of his shoes, and that the footprints and the shoes coincided; that the son of the victim had identified the defendant and that the latter's "girl friend" where he was rooming said he had had a considerable sum of money a month or two previously. Upon that occasion Officer Foster told the defendant he knew that the defendant had purchased an automobile recently and paid $275 cash on account of such purchase, and asked the defendant where he got the money, to which the defendant replied, "Well, . . . I won it gambling." In another conversation the second day after his arrest, one of the officers summarized the evidence against the defendant as consisting of footprints on the job, the son having identified him, handwriting identification, statements by the victim that defendant hit him, his wife and his girl friend "saying he had large sums of money." To this the defendant replied that he did not care to make any explanations to the officers, but denied that he was at the salvage yard on the date of the assault.

On the 13th of March defendant was taken to the hospital where the victim was confined, at which time the latter stated that defendant had worked for him on the day previous to his injury and that he was working with him in the shed "the day that he was injured, and that only him and Richard (the defendant) were in the shed at the time that Mr. Rosenfield received his injury; that he did not know who struck him." Upon this occasion the defendant denied that he was

present at the time of the assault upon Mr. Rosenfield. The officer also testified that while the defendant was in Mr. Rosenfield's presence at the hospital Rosenfield told of a quarrel between himself and the defendant and related a threat uttered by the defendant against him. The defendant testified that no such conversation occurred and that nothing was said by Rosenfield of any quarrel or threats. It might here be noted that when Mr. Rosenfield appeared as a witness he denied ever having had a quarrel with the defendant; denied that the defendant had threatened him, and testified that on the day of the assault the defendant, knowing that Mr. Rosenfield had visited a doctor the preceding day, made inquiry as to the state of Mr. Rosenfield's health.

The defendant, testifying as a witness in his own behalf, stated that he had worked for the Rosenfields some two years prior to the date of the assault; that he worked for them on February 27 and at the close of that day had been paid for his services. He testified that he again worked at the salvage yard on February 28, the day of the robbery; that on that day he went to work about 9:30 and worked until 2:30, when he left, after telling Morris Rosenfield he was not feeling well; that while he was there a customer came in and that he accompanied the customer to the tent to check out some canvas; that later Morris Rosenfield joined him. He testified there was some discussion respecting the price of the canvas, and that while the discussion was in progress the elder Rosenfield told the defendant to go back to the front building. Defendant testified he never saw Rosenfield return to the front building but that Mr. Rosenfield was uninjured when the defendant last saw him. He further testified that he went home and was sick for about eight days; that two or three days after leaving his work he went to the salvage yard for his pay, but that the yard was closed and nobody was there. In explanation of his denial at the time of his arrest that he had recently worked for the Rosenfields, defendant testified that he did so because the officers who arrested him had cursed and threatened him.

As a first ground for reversal, appellant earnestly urges that the verdict of the jury finding him guilty of robbery is contrary to and unsupported by the evidence and is contrary to law. In this regard appellant contends that the evidence for the prosecution does no more than indicate an opportunity for him to commit the crime plus suspicion. It is true that the victim of the assault and robbery was hazy in his recol-

lection of what transpired just prior to and at the time of the assault. Without doubt the violent injuries sustained by Mr. Rosenfield, who was 65 years of age, affected his memory and ability to recite details of the incidents occurring just before and after the attack was made upon him. In fact, a physician who specialized in brain surgery and attended Mr. Rosenfield testified that in the case of a man of Mr. Rosenfield's age the injuries sustained would, in his opinion, "affect the memory or his ability to recite details of incidents before or after the accident or injury." Mr. Rosenfield did, however, testify to the fact that he remembered the defendant was with him in the building where the assault occurred after the customer whom both of them had been serving had departed. But as the doctor testified, one who received the injuries inflicted upon Mr. Rosenfield "will be confused as to things that might have happened immediately before"; and when asked how close the defendant was to him just before he was struck, the victim replied that he could not remember.

We are satisfied that if the conviction is to be sustained from an evidentiary standpoint, it must rest upon whether reasonable inferences are deducible from the surrounding facts and circumstances to justify the jury in concluding that the defendant was the perpetrator of the crime of which he stands convicted. Immediately adjoining and outside of what was referred to as "the front building," where the assault occurred, there is a dock or loading platform. On the south side of this there is a ramp running due east down to Alameda Street. The level portion of the ramp is about three feet above the lot proper. On the ground immediately south of the higher or level portion of the ramp footprints were found about six inches from the base of the ramp. The footprints led in a southerly direction. A fence runs along and adjoining the platform and there was a dirt footpath along there with footprints on it going south. As heretofore indicated, at the trial defendant's attorney made no issue as to whether these footprints were made by the defendant, stating that the defendant was "there." Respondent contends that the evidence concerning footprints justified the jury in concluding that the defendant left the scene of the crime by jumping from the platform and hurrying southward on the path alongside the fence. The defendant in his testimony stated that he came out the front door, walked down the ramp, and did not "go around right next to the platform on the south side of it." In ex-

planation of his admitted footprints on the ground by the platform, defendant testified that "when the customers came there to see those tents, I have to carry them out to the car—truck right there in front." When asked if after coming down this ramp he at any time went up next to the platform on the south side, he replied, "Not that I know of." Appellant points out that the footprint was only six inches away from the base of the platform and that this negatives the contention that it was made by someone hastily leaving the premises and jumping from the ramp in order to expedite his departure. To quote from appellant's closing brief: "A wrongdoer hurrying away from the scene of his crime and jumping from the platform (only three feet high) with the intent of speeding his flight, would not strike the earth at a point only six inches removed from that platform." In view of the conceded presence of the defendant in the salvage yard by reason of his employment there, we are impressed that, giving to the footprint testimony all the probative force claimed for it by respondent, it cannot be said to have a direct and obvious relevancy to the crime charged. (*People* v. *Flores*, 58 Cal.App.2d 764, 769 [137 P.2d 767].)

However, there are present in this case certain circumstances that cannot be reconciled with innocence as reasonably as they can be with guilt. We refer to the defendant leaving his employment early on the day in question without advising the younger Rosenfield, owner of the yard, and without asking for his pay for that day's work, as was his custom, and which custom was followed on the preceding day; his failure to return at any time for the wages due him; also, his admittedly false statements made to the officers at the time of his arrest wherein he denied knowing Mr. Rosenfield and falsely stated that while he had worked for the firm of J. Joseph Company (under which name the salvage yard was operated) "a couple of years prior to this time," he "was not working for him the preceding week." While it is true the defendant testified that he had in fact returned to the salvage yard to obtain the day's wages due him and the place was closed, this merely presented a conflict which the jury was entitled to resolve against him. The same may be said of defendant's explanation of why he falsely denied having recently worked at the yard, which he attributed to the fact that the officers had cursed and threatened him. When the foregoing facts were legally proven to the satisfaction of the jury, the latter was entitled

to draw therefrom such inferences as were "warranted by a consideration of the usual propensities or passions of men, the particular propensities or passions of the person whose act is in question, the course of business, or the course of nature." (Code Civ. Proc., §§ 1958 and 1960, subd. 2.) The corpus delicti having admittedly been proven, we are unwilling to hold that the jury was not entitled to make a deduction from the foregoing proven facts that the defendant was the perpetrator of the crime charged against him. ██ It is well settled that a fact or facts relating to the guilt of an accused may be established by circumstantial as well as by direct evidence; that the right to draw proper inferences from evidence is a function of the jury; and that so long as its conclusions do not do violence to reason or challenge credulity, an appellate tribunal is without power to substitute its finding of the ultimate fact in place of that arrived at by the constitutional as well as the statutory arbiter thereof. Evidence as to circumstances may be as conclusive in its convincing effect as the direct testimony of witnesses to the act charged against the defendant. ██ Here there was proof of opportunity for the defendant to commit the offense, coupled with an unequal opportunity for others (because there is testimony that the customer had departed before the assault); there was proof of false statements which tended to disclose a consciousness of guilt; from all of which the jury reasonably could conclude that the defendant was guilty, as indicated by the verdict. (*People* v. *Kynette,* 15 Cal.2d 731, 744 [104 P.2d 794].) The case of *People* v. *Flores, supra,* relied upon by appellant, is distinguishable from the case at bar. In the cited case it was said (p. 769) : ". . . it is manifest that every fact proven is consistent with the reasonable conclusion that the appellant did not participate in the theft of the automobile. There is, therefore, a failure of proof in particulars necessary to conviction of the crime of grand theft, and the question is one of law for the court." As heretofore pointed out, such is not the case here.

██ It is next urged that the trial court erred in permitting the district attorney, over defendant's objection, to cross-examine him respecting a purported statement to the officers in which he said that he came into possession of considerable money by gambling. In this regard the record reflects that during the presentation of the prosecution's case Officer Foster had testified that on the day following defendant's arrest the officer said to him, among other things, "I find your girl

friend where you are rooming tells me that you had a considerable sum of money back a month or two ago. You tell me you have not been working any place. I also find now that you purchased an automobile recently and paid two hundred, I think it was—$275.00—my recollection now you paid that much cash and you have more to pay here. You had that sum of money. Can you explain to me where you got that money without having worked steadily anywhere.'' The defendant's reply, according to the officer, was, ''Well, I won it gambling.''

The foregoing conversation was admitted over defendant's objection. Subsequently, during the cross-examination of the defendant, the following ensued:

''Q. Had you been working regularly just before you started working on these two days in question?

''A. Had I been working regular?

''Q. Regular?

''A. No sir, not steady.

''Q. You had been out of employment some?

''A. Yes, sir.

''Q. You remember having had a conversation with the officers about money that you had; isn't that true?

''A. Yes, sir.

''Q. You told them that you had been gambling and got considerable money that way?''

Objection to the last interrogatory was overruled, and the defendant's answer thereto was ''Yes.''

The ruling was erroneous. The trial court overruled the objection apparently upon the theory that the part of the conversation here in question came within the rule enunciated in section 1854 of the Code of Civil Procedure, which reads: ''When part of an act, declaration, conversation, or writing is given in evidence by one party, the whole on the same subject may be inquired into by the other; when a letter is read, the answer may be given; and when a detached act, declaration, conversation, or writing is given in evidence, any other act, declaration, conversation, or writing, which is necessary to make it understood, may also be given in evidence.'' From the remarks of the trial judge it is manifest that he correctly understood that what is meant by the code section just cited is that where part of a conversation or writing *material and relevant* to the issues of a case is given in evidence, the other parts of such conversation or writing having *relevant reference* to the part given may also be introduced. (*People* v. *Mahach,*

65 Cal.App. 359, 381 [224 P. 130].) But such is not the case here. The conversation related by the officer had reference to "a considerable sum of money" had by the defendant "back a month or two ago," whereas the robbery here in question occurred only some ten days before the conversation took place. Obviously, whatever money the defendant had "back a month or two ago" could have no materiality or relevancy to the robbery committed some ten days prior to the date of the conversation. Had the evidence shown that at the time of his arrest some ten days after the robbery the defendant had in his possession "a considerable sum of money," and had explained its possession with the statement that he had obtained the same through gambling, then that portion of the conversation relating to the manner in which he obtained the money would be relevant to the issues of the case and the reasonableness of his explanation of how he obtained possession of such money would be a question for the jury. But the money he possessed a month prior to the robbery or the manner in which he obtained possession thereof was wholly foreign to any material or relevant issue in the case at bar.

With reference to that portion of the conversation hereinbefore narrated in connection with the previous purchase of an automobile by defendant, upon which he made a down payment, and in connection with which the officer stated to him he would "have more to pay," we cannot agree with appellant that it was inadmissible. As stated by the trial court, "if it has a tendency to prove that on the 28th day of February (the date of the robbery) the defendant is in need of money, and it is a circumstance which may or may not have any weight or may or may not have any particular significance. But I think it is admissible as a circumstance." In other words, the objection went to the weight rather than the admissibility of that part of the conversation. While the fact that the defendant was in possession of a sufficient sum of money to make an initial payment on a contract to purchase an automobile some time before the date of the robbery would not be material, it was merely preliminary to that portion of the statement with reference to the fact that he was required to make subsequent payments on the purchase price and had not been working steadily immediately prior to the robbery, and which fact might be a circumstance tending to create or prove a motive in a case of this character. While motive constitutes no element of the crime itself, it must be conceded

that in cases where circumstantial evidence is largely relied upon for conviction, as in this case, then motive becomes a matter of most earnest inquiry. If the defendant were confronted with an obligation to meet installment payments on an automobile purchase contract and by reason of not working steadily his financial condition was such that he could not meet the obligation, it was for the jury to determine whether his pecuniary situation tended to directly connect him with the commission of the crime or to disclose a motive for its commission. █ Since that portion of the conversation relative to the purchase of an automobile and that the defendant would ''have more to pay here'' was relevant and material with reference to the question of motive, and he answered that he had obtained the down payment by gambling, we have no difficulty in holding that he was not prejudiced by that portion of the conversation regarding his possession of other money ''a month or two'' before the date of the crime in which he was quoted as saying that he obtained such money by gambling.

█ Finally, appellant asserts that the trial court committed prejudicial error in giving to the jury an instruction concerning circumstantial evidence. The challenged instruction was as follows:

''If the evidence in this case as to any particular count is susceptible of two constructions or interpretations, each of which appears to you to be reasonable, and one of which points to the guilt of the defendant, and the other to his innocence, it is your duty, under the law, to adopt that interpretation which will admit of the defendant's innocence and reject that which points to his guilt.

''You will notice that in this instruction this rule of law is made applicable to cases in which there are two opposing interpretations, each of which appears to you to be reasonable.

''This rule of law does not apply in a case where there are two opposing constructions sought to be placed upon the evidence, one of which appears to you to be reasonable and the other appears to you to be unreasonable.

''In the latter case it would be your duty, under the law, to adopt the reasonable construction and reject the one which, in your judgment, appears to be unreasonable.''

Conceding the correctness of the first two paragraphs of the questioned instruction, appellant contends that paragraph 3 thereof is purely an argument on the application of the

first two paragraphs and that paragraph 4 is an incorrect statement of the law. No authority is cited by appellant in support of these claims. We cannot agree with appellant when he urges that "the last paragraph of the instruction advises the jury that if the reasonable construction pointed to guilt they should adopt it and return a verdict of guilty."

Instructions should not be considered singly but in their entirety. (*People* v. *Curtis*, 36 Cal.App.2d 306, 322 [98 P.2d 228].) In addition to the instruction complained of, the court advised the jury of the presumption of innocence as well as of the doctrine of reasonable doubt, and also, at the request of the defendant, instructed the jury that "it is the law that neither mere opportunity to commit a crime, nor suspicious circumstances are sufficient to support a verdict of guilty. The guilt of a defendant necessary to justify a conviction must be shown and based upon such evidence as will convince a reasonable mind beyond a reasonable doubt." We are satisfied that the jury was fully and fairly instructed that the defendant could not be convicted unless his guilt was established by competent evidence beyond a reasonable doubt. Furthermore, the challenged instruction and a similar attack made upon it was reviewed in the case of *People* v. *Horowitz*, 70 Cal.App.2d 675, 703 [161 P.2d 833], where the instruction here challenged was approved.

The judgment and the order denying defendant's motion for a new trial are, and each is, affirmed.

York, P. J., and Doran, J., concurred.

A petition for a rehearing was denied May 10, 1946.