[Crim. No. 3471. First Dist., Div. Two. Nov. 21, 1958.]

THE PEOPLE, Respondent, v. WALTER E. BIGELOW et al., Appellants.

*Assigned by Chairman of Judicial Council.

Allan Brotsky and Robert E. Tarbox, under appointment by the District Court of Appeal, McMurray, Brotsky, Walker, Bancroft & Tepper and Lloyd E. McMurray for Appellants.

Edmund G. Brown, Attorney General, Clarence A. Linn, Chief Assistant Attorney General, and Peter T. Kennedy, Deputy Attorney General, for Respondent.

KAUFMAN, P. J.—Defendants were charged by indictment with violation of Penal Code, section 211 (armed robbery). The indictment also charged one prior conviction of robbery as to the defendant Bigelow and two prior convictions, robbery and burglary, as to the defendant Jameson. The prior convictions were admitted and pleas of not guilty entered. A jury trial resulted in a verdict of robbery in the first degree as to each defendant. The defendants' motion for a new trial was denied, and both sentenced to the state prison. From the judgment of conviction and order denying his motion for a new trial, each defendant appeals.

The record reveals the following: On Sunday, July 14, 1957, about 10:30 p. m., just after several customers had left, four men, wearing nylon stocking masks and all carrying guns, entered the Ritz Poodle Dog Restaurant at 65 Post Street in San Francisco. At this time Louis LaLanne, the owner and his wife, two waiters and about half a dozen customers were in the restaurant. The first man who entered had something tied around the lower part of his face and was wearing a gray sport coat, a gray flat hat and dark goggles and was carrying a gun. LaLanne also noticed a heavy set man with a pasty face, wearing a dark suit on the other side of the room. Subsequently, LaLanne picked the defendants Jameson and Bigelow, respectively, out of a police line-up as resembling these two men in physical appearance.

The first man went up to LaLanne who was standing at the cash register near the door, asked for money and where the safe was located. Upon being told that the safe was in the back, in the passageway to the kitchen, everyone was told to

go to the back of the restaurant. While Mr. LaLanne gave the men the key to the safe at gunpoint, a necklace was taken from Mrs. LaLanne. Not finding very much in the safe, the robbers asked LaLanne where the money was. He told them it was in the register. Some of the men took all the other people downstairs and locked them in a closet. Meanwhile, Mr. LaLanne was searched, his wallet and diamond ring taken, and he was tied to a chair with his back to the cash register. The money and objects taken were put into a white sack. LaLanne looked up and in the mirror at the rear of the restaurant, saw one of the men raise the curtain on the front window. They then whispered, asked how they could get out, and LaLanne replied there was either the front door or a way through the basement and the freight elevator, which moved very slowly. LaLanne took the men downstairs to show them the elevator which was full. He was then taken back upstairs. While downstairs the men saw Anthony Forni, the headwaiter who was changing his clothes. Forni was threatened and taken upstairs to the balcony. While there he heard a crash and then noticed a white sack, a pillow slip. Meanwhile, Gil Hodges, another waiter, who had not been seen by the robbers, slipped away through the basement, and hailed a cab to call the police. He then waited for the police in front of the restaurant. While he was waiting, he noticed someone raising a part of the curtain on the front window and saw a short heavy man in a dark suit in front of the cash register. Hodges subsequently identified the defendants as resembling two of the robbers.

LaLanne then noticed one of the men go up to the balcony to the ladies room. The window of the ladies room led to the kitchen, and was painted on both sides to match the walls. The man kicked the window out and the broken window fell into the kitchen. By this time, LaLanne had been taken to the kitchen by the robbers. The men asked him if there was any other way to get out, and he indicated the skylight above the broilers. All four of the men climbed over the broiler and escaped through the skylight. The white sack containing about $800-$900, a steel file from the safe, and the necklace were found.

The janitor of the Bunker Hill building at 660 Market Street testified that about 11:15 p. m. on July 14, 1957, as he was working in the basement, he heard a noise. He came up to the lobby on the elevator and as he opened the elevator door, two men, one of them with a gun, told him to open the

front door of the building. He opened the door at gunpoint and saw the men leave and one of them grab a car on Market Street. Later, when the police arrived, he noticed blood stains in the lobby and on the stairs from the second floor to the lobby, as well as broken glass about the doors to Room 210. Warren Daming, an employee of the San Francisco Examiner, testified that about 10:30 or 10:45 p. m. on the evening in question, he was returning to his car which was parked on Market Street near the Bunker Hill building. As he started to drive away from the curb, two men, one of them with a gun, entered the car. The man with the gun said: "Drive us out of here and nobody will get hurt. We're desperate." Daming got out of the car on the left side, watched the two men drive west on Market Street, and ran towards Kearny Street to find a policeman. The record does not indicate what became of the other two robbers.

The police arrived at the Poodle Dog Restaurant between 11:05 and 11:15 p. m. After questioning Mr. LaLanne and the others, the police in their search for a getaway car, took the license numbers of a number of vehicles parked in the area near the restaurant. About 12:15 they noticed a two-door Mercury parked facing north on the east side of Kearny Street between Sutter and Post Streets. The keys were in the ignition and the engine was warm. The vehicle was registered to the defendant Bigelow at an Irving Street address. The police took the license number of the car and returned to the Hall of Justice to check their records about 1 p. m. When they returned to Kearny Street, the Mercury was gone. The police then proceeded to the Irving Street address, but did not find the defendant Bigelow.

Subsequently, the Mercury was found parked on the north side of Geary Street about 50 feet east of Jones Street. There was no one in the car and the keys were in the ignition. At about 4:30 a. m. the defendants drove up in a Pontiac and parked a few feet behind the Mercury. The defendant Bigelow was arrested just as he and his wife were entering the Mercury. The defendant Jameson, who was with a girl named Valerie Shell, was also arrested at this time. The arresting officer noticed that the defendant Jameson had a bandage on his finger and that the defendant Bigelow had coagulated blood on his ear. At the time of his arrest Jameson was dressed in blue slacks and a gray coat. He had a bloody napkin in his coat pocket which he subsequently tried to conceal. In the Mercury, the police found several articles of

clothing. The defendant Bigelow told the police that most of the articles were children's clothes and asked that these be given to his wife; when asked about a white coat, he asked the police to send the coat to a girl at an out-of-state address. Subsequently, the defendant Jameson identified the coat as his.

As each of the defendants bases his appeal on different grounds, the contentions will be considered separately.

On appeal, the defendant Jameson contends that the judgment of conviction as to him must be reversed because, (1) The evidence is insufficient to support the verdict; (2) The misconduct of the district attorney in the opening argument; (3) A miscarriage of justice under article VI, section $4\frac{1}{2}$ of the state Constitution as the district attorney misstated the facts; (4) The trial court abused its discretion in denying his motion for a new trial.

As indicated in the statement of facts, two witnesses identified the defendant Jameson as looking like the robber in the dark suit. The police criminologist testified that the pieces of glass found in the defendant Jameson's trouser cuffs corresponded to the old type matted window glass in the ladies room at the restaurant; that the fibers of the defendant Jameson's shirt matched the fibers found in the scrapings made by the police in the area around the skylight; that the grease and paint particles found on defendant Jameson's pants matched the grease and paint found in the scrapings from the area around the skylight; that "A" type blood was found on defendant Jameson's shirt-tail and trousers and in the Bunker Hill building. The defendant Bigelow had established that his blood was "O" type.

Valerie Shell testified that on July 14, she spent the day with Jameson. About 5 p. m. he drove her (in her car, a Pontiac) to her job at the Café Mexicali on Geary Street. He helped her in the restaurant for a while and then left. He returned about 8-8:15 p. m. told her that the Pontiac was parked across the street, and that he would meet her at the apartment after she was through working about 10 p. m. She got through with her work about 10:10 p. m. She heard about the robbery of the Poodle Dog Restaurant over the radio before she left work. She drove home in her car. As she was pulling out of her parking place, she thought she saw a car like Bigelow's with two people in it. She arrived home about 10:20 and changed her clothes. Jameson telephoned her about 11:10 or 11:15 p. m. and picked her up a few minutes later, about 11:30 p. m. When she saw Jameson earlier in the

evening, he did not have any cuts on his hand; however, when he called for her about 11:30 p. m. he told her he had cut his finger. She put a bandage on his finger. They drove to San Bruno and arrived at Artichoke Joe's about midnight. On the way back to the city, they stopped to pick up two hitch-hiking sailors. They did not see the Bigelows until after 2 a. m.

In a conversation with the police on July 16, Jameson could not remember having been at Artichoke Joe's or picking up any sailors as he had been drunk. He further stated that he had been with the Bigelows from about 10 p. m. on. He made conflicting statements as to when and where he had picked up Valerie Shell. Jameson did not testify at the trial. Bigelow testified that he first saw Jameson about 2 a. m. At the time of his arrest, Jameson stated he had cut his finger while shaving. After his arrest, he told Valerie Shell he had cut himself on a can of cat food while feeding her cats on the evening of July 14. On Tuesday, July 16, Jameson stated he had cut himself on the car keys when he was arrested.

Bigelow testified that when he first saw Jameson, Jameson was wearing navy blue pants and a gray sport coat, and that Jameson's hand was bleeding while he was being fingerprinted.

It would appear from the above that there is ample evidence to support the jury's verdict. ■ On appeal, the verdict of the jury cannot be set aside unless it appears that upon no hypothesis whatsoever is there sufficient evidence to support the conclusion reached. (*People* v. *Small,* 159 Cal.App.2d 582 [324 P.2d 10].) Defendant Jameson, in his brief, urges that there were inconsistencies in the expert testimony of the police criminologist. ■ The weight and effect of expert testimony is a matter properly left to the jury. (*People* v. *Taylor,* 152 Cal.App.2d 29 [312 P.2d 731].)

■ The first alleged incident of misconduct by the prosecution is the following:

". . . That's a good alibi. But it doesn't hold because Valerie Shell destroyed it. After all, Mr. Jameson was in custody, and before anyone had a chance to reach Valerie Shell, the police took a statement from her, and what does she say? She says——

"Mr. Davis: I'm going to object to that, your Honor, 'before any——.' There's not the slightest bit of evidence here that anybody attempted to reach Valerie Shell at any time. I ask that the jury be asked to disregard that statement.

"THE COURT: Is that true? Is that true, Mr. Mayer?

"MR. MAYER: What, your Honor?

"THE COURT: That nobody tried to reach Valerie Shell? That's his objection.

"MR. DAVIS: Yes. He stated that before the police, before anybody could reach Valerie Shell——

"MR. MAYER: I'll withdraw that. I'll withdraw that. Before Jameson, then, could talk to Valerie Shell, a statement was taken from her by the police, and she testified pretty much to that statement pretty much."

The record shows that after the objections by the defendants' counsel, the district attorney reframed his statements. Thereafter, no further objections were made, and cannot now be raised. (*People* v. *Amaya,* 40 Cal.2d 70 [251 P.2d 324].) Defendant Jameson's counsel also elaborated on Valerie Shell's testimony and argued it to the jury, thus, further waiving the matter. (*People* v. *Coontz,* 119 Cal.App.2d 276 [259 P.2d 694].) The record further indicates that the jury at the outset of the trial was properly admonished to disregard remarks made by counsel. Therefore, it may be presumed that they acted uninfluenced by the argument of counsel. (*People* v. *Green,* 13 Cal.2d 37 [87 P.2d 821].)

█ The second error alleged is that the district attorney misstated the facts, since he implied that Jameson must have been at the scene of the robbery because Jameson's counsel asked Mr. LaLanne whether he had worn his glasses on the night of the robbery. The defendant Jameson's counsel also elaborated on the matter of the glasses in his argument. In view of that fact and defendant's failure to object at the trial, we think the defendant Jameson has waived this matter. Furthermore, we do not think the defendant has established prejudice from either of these incidents, nor can we find any abuse of discretion in the trial court's denial of the motion for a new trial. (*People* v. *Beard,* 46 Cal.2d 278 [294 P.2d 29].) We conclude therefore that the judgment of conviction as to the defendant Jameson should be affirmed.

On appeal, the defendant Bigelow contends that the judgment of conviction as to him must be reversed because: (1) The prosecution called his wife as a witness, and (2) The prosecution commented on her failure to testify; (3) The district attorney expressed a personal view of the defendant's alibi; (4) Other misconduct of the district attorney; (5) The court erred in admitting evidence about his financial condition; (6) The court erred in asking him if he waived his

objection to his wife's testimony; (7) The court abused its discretion in denying his motion for a new trial.

■ Defendant Bigelow argues that because he testified he spent the afternoon with his wife at drag races in South San Francisco (where he received the injury to his ear) and spent the evening with his wife, drinking and eating in various bars in San Francisco, it was error for the prosecution to call Mrs. Bigelow as a witness for the prosecution. At the argument on the motion for a new trial the district attorney stated:

"I would like the record to show, and I will file an affidavit if need be, that I at no time prior to putting Mrs. Esther Bigelow on the stand, ever talked to that witness; never talked to her either on the phone, in person or any other way. I sent a subpoena out by a Police Officer, I had no way of knowing whether that witness was going to testify or not, but I had a statement that she had given the Police Department in the early stages of this case and I was calling her based purely upon that statement. I had no way of knowing whether she was going to follow that statement or she wasn't, but I was willing to take that chance that she would follow the statement she had previously given the Police."

Defendant Bigelow, citing *People* v. *Gill,* 143 Cal.App.2d 46 [299 P.2d 682], urges that the district attorney called the defendant's wife, knowing she would not testify, in order to create an unfavorable impression of the defendant. After establishing that Mrs. Bigelow was the wife of the defendant and had been his wife on July 14, 1957, the following ensued:

"Q. Now do you have any objection to testifying in this matter? A. Yes, I do.

"THE COURT: In other words,——

"MR. MAYER: Your Honor, I think, under the law——

"THE COURT: In other words, you don't want to testify against your husband, is that correct?

"THE WITNESS: That's right.

"THE COURT: I might advise the jury that under the circumstances, a wife is not compelled to testify against her husband, nor is the husband compelled to testify against the wife. That's the right that they have. Now you're exercising that right, are you?

"THE WITNESS: Not—Well, yes.

"THE COURT: All right. I guess that ends that, is that right?

"MR. MAYER: Well, there's nothing I can do, your Honor.

"THE COURT: All right. You don't waive any right, do you, to have your wife testify?

"DEFENDANT BIGELOW: Pardon?

"THE COURT: You don't waive any right to have your wife testify, do you?

"DEFENDANT BIGELOW: No, I don't.

"THE COURT: All right. You may step down."

In *People* v. *Wilkins,* 135 Cal.App.2d 371 at page 379 [287 P.2d 555], this court (Division One) said: " 'Recent authority is to the effect that if the prosecution desires to use the husband or wife of the defendant as a witness the proper procedure is to offer the spouse as a witness, subject to the claim of privilege by the defendant.' " There was, therefore, no error in the procedure used by the district attorney, nor in the court's question of the defendant.

██ Defendant Bigelow next argues that the following comment by the district attorney constitutes prejudicial error:

"Now what else do we have in regards to Mr. Bigelow? We have his own admission that at the very time in question that's important to him in this case, he's in a public bar, that he arrives there about 10:15 or 10:30, and at that time he sees a number of people—he says he's been thinking about this, he's got them all in mind, he names them, names a cab driver, whose last name is Donovan, a buddy, the swamper, the bar owner, and his wife . . . and not one witness who he said was there at the very time of the robbery, that the robbery was going on, has he produced these friends of his, has he produced to corroborate his presence in the Criterion, and the first time we find out about it, that there are such people, was yesterday afternoon . . .

". . . And yet we were forced, and when I say forced, that's exactly what I mean—We were forced to bring a witness into this case to disprove that statement, and we had to bring in his girl friend who had no constitutional inhibitions about her right to testify. She was in no position to claim any privilege. She had to testify whether she liked it or not, and you can bet your life if we hadn't called her, she never would have been called in this case and this case would have gone to you on the basis that the statement given Inspector Sutton was the truth, and that Mr. Jameson was with Valerie Shell from 10:00 o'clock that night on. We take witnesses where we find them. In this case we had to take Valerie Shell in order to disprove that, a close associate of the defendant, and she, because she had already told us these things, had to testify

against him because she could not hide behind any alleged privilege. She had to come out and dispute the very thing that Jameson was relying upon as an alibi. And when I say that we had to call her, it was that important. And I say, as I said before, if we hadn't called her, it would have been just like the rest of the defense case, she never would have been called, just like any other witness that could support any alibi given by any defendant in this case has not been called to substantiate or corroborate it, even though these very people are the close associates and friends of these defendants.''

As these are indirect references by the district attorney and the jury was properly admonished as to Mrs. Bigelow's right not to testify, this case is distinguishable from *People* v. *Wilkes,* 44 Cal.2d 679 [284 P.2d 481], relied upon by the defendant. ''. . . [I]n the light of the entire record, we are satisfied that such brief and indirect reference was not sufficiently important to prejudice defendant in the eyes of the jury and result in a miscarriage of justice.'' (*People* v. *Green,* 47 Cal.2d 209, 214 [302 P.2d 307].)

▋ The district attorney made the following comment on the defendant's alibi:

''He suddenly switches his defense to why we didn't produce Mr. Bolen. Inspector Sutton did check out the Criterion, and what does he tell you? He tells you that it was impossible to pinpoint the time Bigelow was there, and there's no question Bigelow was there. He was there at 2:00 o'clock in the morning. Of course, Mr. Bolen would say he was there. But when? The Inspectors were unable to pinpoint it, and do you think for a moment that if we were able to pinpoint the time that Mr. Jameson, that Mr. Bigelow was in that bar as being between 10:30 and 11:30, that this case would be tried against Mr. Bigelow? What kind of office does Mr. Davis think we run? If we have evidence that Mr. Bigelow has an alibi and it's a good one, he wouldn't be charged, he wouldn't be on trial. And the evidence in this case shows that that is not so. People are available that he could have called and he didn't call them or let them testify.''

We do not think these remarks are expressions of the district attorney's belief in the guilt of the defendant like the remarks condemned in *People* v. *Edgar,* 34 Cal.App. 459 [167 P. 891] and *People* v. *Kirkes,* 39 Cal.2d 719 [249 P.2d 1]. Defendant did not object to these remarks at the trial and may not now raise the matter on appeal. (*People* v. *Crosby,* 139 Cal.App. 2d 101 [292 P.2d 922].) Furthermore, the record indicates

that these remarks were invited by defendant's counsel, and therefore, do not constitute prejudicial error. (*People* v. *Martin,* 127 Cal.App.2d 777 [274 P.2d 509].)

Defendant next cites as misconduct of the prosecution the argument to the jury previously quoted herein on the appeal of the defendant Jameson. The record indicates these remarks were rephrased. Thereafter, no further objections were made, thus constituting a waiver. (*People* v. *Amaya,* 40 Cal.2d 70 [251 P.2d 324].) Defendant also cites certain remarks of the district attorney's about tampering with witnesses. The record shows, and defendant concedes, that these remarks were made out of the presence of the jury and could not, therefore, have been prejudicial.

Defendant next argues that under the rule of *People* v. *Gorgol,* 122 Cal.App.2d 281, 304 [265 P.2d 69], the court erred in admitting testimony about his financial condition. However, in that case the court recognized the following exceptions:

". . . For example, it may be shown that prior to the date of the alleged crime the defendant was without money and immediately thereafter he had a large amount of money. (Citations.) Another exception appears in *People* v. *Richards,* 74 Cal.App.2d 279 [168 P.2d 435], where evidence was held admissible to show that prior to the robbery the defendant had made a down payment on an automobile and was required to make subsequent payments on it, that he was not working and had no finances with which to meet the obligation. '. . . it was for the jury to determine whether his pecuniary situation tended to directly connect him with the commission of the crime or to disclose a motive for its commission.' (P. 290.) The court stated further (p. 289) : 'As stated by the trial court, "if it has a tendency to prove that on the 28th day of February (the date of the robbery) the defendant is in need of money, and it is a circumstance which may or may not have any weight or may or may not have any particular significance. But I think it is admissible as a circumstance." '

"In robbery motive constitutes no element of the crime itself; still, where circumstantial evidence is largely relied upon for conviction, motive may be inquired into."

We think the evidence here was properly introduced as it meets the test set forth in *People* v. *Peete,* 28 Cal.2d 306 at page 315 [169 P.2d 924]. The court pointed out that the evidence was a circumstance for this jury to weigh and consider.

Nor can we find any abuse of discretion in the court's denial of the defendant Bigelow's motion for a new trial. We conclude therefore that the judgment of conviction as to the defendant Bigelow should be affirmed.

No prejudicial error appearing in the record before us, the judgment as to both defendants is hereby affirmed.

Order denying motion for new trial is affirmed.

Draper, J., and Martinelli, J. pro tem.,* concurred.

The petition of appellant Bigelow for a hearing by the Supreme Court was denied January 14, 1959. Carter, J., and Schauer, J., were of the opinion that the petition should be granted.

*Assigned by Chairman of Judicial Council.