[Crim. No. 14914.   Second Dist., Div. One.   Apr. 8, 1969.]

THE PEOPLE, Plaintiff and Respondent, v. THOMAS D. WILLINGHAM et al., Defendants and Appellants.

Albert D. Silverman, under appointment by the Court of Appeal, Richard S. Buckley, Public Defender, Lothair Schoenheit, John J. Gibbons, James L. McCormick and Joel S. Peck, Deputy Public Defenders, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Phillip G. Samovar, Deputy Attorney General, for Plaintiff and Respondent.

FOURT, Acting P. J.—This is an appeal by each of the defendants from a judgment of conviction of attempted robbery and murder.

In an information filed in Los Angeles on August 18, 1967, Willingham and Peters were jointly charged in count 1 with attempting to rob Alonza Warden on April 24, 1967, and further it was charged that each of said defendants was armed with a deadly weapon, namely a revolver. In count 2 defendants were charged with murdering Alonza Warden. It was further charged that Peters had previously been convicted of a narcotics offense in a federal court in 1956 and had served a term in prison therefor, that in Idaho in 1958 he had been convicted of grand larceny and had served a term in prison therefor and that in 1964 in Los Angeles he was convicted of robbery and had served a term in prison therefor. It was further alleged that Willingham previously had been convicted of a felony in Los Angeles in 1960 and had served a term in prison therefor. Peters admitted the first charged prior felony conviction and the prosecutor moved that the second and third charged felony convictions be stricken and the motion was granted. Willingham admitted the charged prior felony conviction as alleged against him. In a jury trial defendants were found guilty of attempted robbery and murder in the first degree. Peters was found to have been armed. As to count 2 each of the defendants was sentenced to the state prison for the term of their natural lives—as to count 1 each was sentenced to the state prison for the term prescribed by law. The sentence as to count 1 was stayed until the sentence as to count 2 was satisfactorily completed and at that time the stay as to count 1 to become permanent. Each defendant appeals from the judgment and Willingham attempts in addition thereto to appeal from the order denying his motion for a new trial.

A résumé of some of the facts is as follows: on April 24, 1967, at about 7 p.m. Alonza Warden was engaged as an attendant in a Phillips 66 gasoline service station on West Boulevard. Toula Pessah drove into the station at about the time mentioned and saw Warden in another part of the station talking to the defendants who were facing him. As Warden started out of the station proper toward the Pessah car Mrs. Pessah saw the two defendants approaching in the same direction and Peters shot Warden. There was also a second shot, Warden got to the pump island, slumped down

and said to Mrs. Pessah, ''Somebody call the police.'' Warden then collapsed.

John Hacks, an employee of a Mobile gasoline service station across the street, heard the shots, started to the assistance of Warden and saw two men resembling defendants leave the Phillips 66 station, go to a 1962 white Mercury station wagon and drive away.

Mrs. Pessah drove to a liquor store nearby and caused a call for the police to be made. Officer Field, of the Los Angeles Police Department, arrived at the Phillips 66 station very shortly and saw Warden seated against a gas pump. Warden was dead from the gunshot wounds at that time.

William Widner saw defendants during the week of April 24 in a Mercury station wagon. Officer Chittenden interviewed Widner and apparently ascertained that Catherine Marks, who lived about 2 miles from the murder-robbery scene, might have some information with reference to the case. Catherine Marks stated that defendants came to her house shortly after 7 p.m. on April 24, 1967, and asked if they could stay at the house for a while as they had just shot a person. She told defendants that they could not stay.

Donna Murphy in the latter part of April 1967 was with defendants in a car stolen by Willingham and with them drove to Texas. After the murder and while in the stolen car, she heard a conversation between defendants with reference to a gun. Willingham suggested to Peters ''Don't you think we ought to get rid of that gun,'' and Peters responded that it was all right where it was.

On May 6, 1967, Rene Lawson, a United States Customs Inspector at the border station between Mexico and Del Rio, Texas, had occasion to stop a 1967 Ford Galaxie automobile, California license plates TQS 507 which was coming into this country from Mexico. Willingham was driving the car, with Murphy and Peters as passengers. Lawson noticed that Peters was wearing a jacket although the day was very hot and Peters had his right hand in the jacket pocket. The customs officer asked Peters to open the glove compartment of the car as considerable contraband was being brought into the country. Peters removed his right hand from the jacket pocket and as he did so, the officer saw the butt of a revolver. The officer took the gun and Peters was placed in custody. George Pride, another customs agent, assisted after Lawson had stopped the car, as did Customs Port Investigator Price. A revolver was found on Willingham and a .22 caliber revolver was found

with Donna Murphy. The wounds which brought about the death of Warden were caused by bullets which appeared to be of about .22 caliber. A Bank of America money bag with a certain type string was also located in the car in which defendants were riding.

Charles Warden, the son of the deceased victim of the shooting, identified the money sack as being identical to the money bag his father had at the station.

Officers Farrar and Chittenden went to Texas to bring defendants to California. Chittenden advised Willingham that he had a right to remain silent, that anything he said could and would be used against him in a court of law, that he had the right to an attorney during any questioning if he wished one and that if he could not afford to hire an attorney one would be appointed for him without financial charge. Farrar asked Willingham whether he had changed the color of his hair and Willingham stated that he had.

Defendants each testified at the trial and each denied that he had anything to do with the attempted robbery or murder. Peters stated that he was never in possession of a white Mercury station wagon, that he did not know a woman named Marks, that he had gone to Texas to seek employment, that he was not aware that the car which was used in the drive to Texas was stolen.

Appellant Peters now asserts that the trial court had no jurisdiction over him, that the evidence is insufficient to support the judgment, and that it was reversible error for the prosecution to cross-examine him with reference to certain of his testimony.

Appellant Willingham asserts that the trial court had no jurisdiction over him, that the evidence is insufficient to support the judgment, that it was reversible error for the prosecution to elicit certain testimony and to make certain comments to the jury during argument, that the trial judge should have severed the defendants for trial and that the court failed to give an important jury instruction.

Appellants' jurisdictional argument is based on their claim that they were not represented by counsel at their extradition proceedings in Texas and that therefore the court in California had no jurisdiction to hear the cause. This court in *People v. Sergent*, 183 Cal.App.2d 342, 345-347 [6 Cal.Rptr. 576] appropriately stated: "His [appellants'] theory is that because of what was done to him in Arizona his return to California was illegal and therefore the court in California

had no jurisdiction to proceed with the matter of the charges set forth in the information.

"The court in *People* v. *Pratt*, 78 Cal. 345, 349-350 [20 P, 731] stated:

" 'The defendant being before the proper court, which had jurisdiction of his offense, it matters not how he may have entered into the presence of the court, it was its duty to try him.

. " ' "The jurisdiction of the court in which the individual is found is not impaired by the manner in which the accused is brought before it." (*Mahon* v. *Justice*, 127 U.S. 708 [8 S.Ct. 1204, 32 L.Ed. 283], and cases cited.)

" ' "It would indeed be a strange conclusion if a party charged with a criminal offense could be excused from answering the government whose laws he had violated, because other parties had done violence to him, and also committed an offense against the laws of another state." [Citations.]

" 'The governor of the state cannot oust the courts of the commonwealth of their right to try an individual charged with an offense over which they have jurisdiction, because of the fact that he has been instrumental in having the defendant there, by violation of his personal rights. It will not do to say that a fugitive from justice can escape the punishment for his crime because the governor of a state may have violated some law. The people of a state are not bound by any illegal act of their governor, nor should they be.'

"Even assuming that the defendant was in effect 'kidnapped' and brought to California for trial without proper extradition proceedings, it would be no ground for the reversal of the judgment in this case. The defendant received a fair and impartial trial in this state, with adequate constitutional safeguards, and the evidence of his guilt is overwhelming. [Citations.]

"In the case of *Frisbie* v. *Collins*, 342 U.S. 519 [72 S.Ct. 509, 96 L.Ed. 541], Collins, in a petition in habeas corpus alleged that while he was living in Chicago, Michigan officers forcibly seized, handcuffed, blackjacked and took him to Michigan where he was convicted of murder and was then serving a life sentence. Collins claimed that the trial and conviction under such circumstances were in violation of the due process clause of the 14th amendment. The court stated:

" 'This Court has never departed from the rule announced in *Ker* v. *Illinois*, 119 U.S. 436, 444 [30 L.Ed. 421, 7 S.Ct. 225], that the power of a court to try a person for crime is not

impaired by the fact that he had been brought within the court's jurisdiction by reason of a ''forcible abduction.'' No persuasive reasons are now presented to justify overruling this line of cases. They rest on the sound basis that due process of law is satisfied when one present in court is convicted of crime after having been fairly apprized of the charges against him and after a fair trial in accordance with constitutional procedural safeguards. There is nothing in the Constitution that requires a court to permit a guilty person rightfully convicted to escape justice because he was brought to trial against his will.'

''In the note immediately following the opinion it is set forth:

'' 'Where a person accused of crime is found within the territorial jurisdiction wherein he is so charged, and is held under process legally issued from a court of that jurisdiction, neither the jurisdiction of the court nor the right to put him on trial for the offense charged is impaired by the manner in which he was brought from another jurisdiction, whether by kidnaping, illegal arrest, abduction, or irregular extradition proceedings. [Citations.]'

''In *Mahon* v. *Justice*, 127 U.S. 700 [8 S.Ct. 1204, 32 L.Ed. 283], Mr. Justice Field, speaking for a majority of the court, said for the court:

'' 'So in this case, it is contended that, because under the Constitution and laws of the United States a fugitive from justice from one State to another can be surrendered to the State where the crime was committed, upon proper proceedings taken, he has the right of asylum in the State to which he has fled, unless removed in conformity with such proceedings, and that this right can be enforced in the courts of the United States. But the plain answer to this contention is that the laws of the United States do not recognize any such right of asylum, as is here claimed, on the part of a fugitive from justice in any State to which he has fled; nor have they, as already stated, made any provision for the return of parties who, by violence and without lawful authority, have been abducted from a State. There is, therefore, no authority in the courts of the United States to act upon any such alleged right. In *Ker* v. *Illinois* the court said that the question of how far the forcible seizure of the defendant in another country, and his conveyance by violence, force, or fraud to this country could be made available to resist trial in the state court for the offense charged upon him, was one which it did not feel

called upon to decide, for in that transaction it did not see that the Constitution, or laws, or treaties of the United States guaranteed to him any protection. So in this case we say that, whatever effect may be given by the state court to the illegal mode in which the defendant was brought from another State, no right, secured under the Constitution or laws of the United States, was violated by his arrest in Kentucky, and imprisonment there, upon the indictments found against him for murder in that State.' ''

The court in *People* v. *Garner,* 57 Cal.2d 135, 141 [18 Cal. Rptr. 40, 367 P.2d 680], stated:

''Defendant contends: First: *That the trial court was without the power to try him for the alleged murders because of the method used by the arresting officers in bringing him to California.*

''This contention is devoid of merit. It is immaterial whether there was a compliance with the Mexican extradition laws or Arizona laws on arrest and extradition. California follows the federal rule relative to the trial of a defendant who has been obtained from outside the jurisdiction of this state. The rule is that it is immaterial whether a defendant has been forcibly seized in another country or state and transferred to this state by violence, force, or fraud for trial for an offense alleged to have been committed in this state, there being no provision in the Constitution, laws or treaties of the United States which guarantees him any protection in such transaction. [Citations.]'' (See also *In re Fedder,* 143 Cal. App.2d 103, 109 [299 P.2d 881].)

We are persuaded that even assuming that appellants were without counsel at their extradition proceedings in Texas, the California court had the jurisdiction to try them for the attempted robbery and murder which they committed in California.

The argument with reference to the insufficiency of the evidence is based upon the premise that the prosecution failed to establish that there was an attempted robbery and therefore the murder could not have been murder in the first degree under the felony-murder rule.[1] The jury upon suffi-

---

[1]Section 189, Penal Code:

''All murder which is perpetrated by means of poison, or lying in wait, torture, or by any other kind of wilful, deliberate, and premeditated killing, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary, mayhem, or any act punishable under Section 288, is murder of the first degree; and all other kinds of murders are of the second degree.''

cient evidence found the defendants guilty of attempted robbery. Without detailing the evidence suffice it to say that Mrs. Pessah saw appellants talking to Warden, saw Warden come toward her car, saw Peters shoot Warden and heard Warden say, "Somebody call the police"; that appellants went to the residence of Mrs. Marks about 2 miles away and asked for temporary hiding as they had just shot a man; that Willingham stole a car and with Peters and Donna Murphy headed for Texas and Mexico and while on the way Willingham suggested to Peters that it might be well "to get rid of that gun" and Peters stated that it was all right where it was; that the service station employees across the street from the robbery-murder scene heard the shots and saw two persons who resembled appellants hurriedly leaving the scene; that the son of the victim identified the money bag found in the car which appellants occupied as being the money bag in which his father kept money.

Robbery is defined in section 211, Penal Code.[2] ■ To constitute an attempt there must be a particular crime and a direct ineffectual act done towards its commission. (1 Witkin, Cal. Crimes (1963) p. 90.) Clearly there was sufficient evidence of an attempted robbery.

Peters makes the additional claim that the victim's son was in the courtroom after the judge had ordered that all witnesses who were to testify should stay outside the courtroom. Apparently the son was in the courtroom and up until a later time the prosecutor did not know that the son would be called as a witness with reference to the money bag. As soon as it was ascertained that the son would be a witness he was excluded from the courtroom. ■ The rule is that it lies within the sound discretion of the trial judge as to whether witnesses shall be excluded. (See *People* v. *Garbutt,* 197 Cal. 200, 205 [239 P. 1080]; *People* v. *Boyden,* 116 Cal.App.2d 278, 283 [253 P.2d 773]; *People* v. *Persky,* 167 Cal.App.2d 134, 139 [334 P.2d 219].)

■ As stated in *People* v. *Tanner,* 77 Cal.App.2d 181, 187 [175 P.2d 26]:

"The next point urged by the appellant is that the trial court committed prejudicial error in permitting Painter to testify in rebuttal although he remained in the courtroom in

[2]Section 211, Penal Code:
"Robbery defined. Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear."

contravention of the order of the court excluding 'the other witnesses' made while Painter, as the first witness, was on the stand. The violation of an exclusion order does not render the witness incompetent to testify, nor does it furnish grounds to refuse permission to testify. In fact, to refuse to permit such a witness to testify would be error. The witness who violates the order of exclusion may be guilty of reprehensible conduct, and such witness may be punishable by contempt, and such conduct may affect the witness' credibility, but it does not affect the admissibility of the evidence. [Citation.] While the Duane case involved a witness for the defense it is obvious that the rule must apply to either a prosecution or defense witness.''

■ Appellants assert that all comments and evidence which related to the guns found by the customs officers on the persons of appellants constituted prejudicial error. There was evidence with reference to the guns which appellants possessed at the time of their arrest by the customs officers. The guns were not introduced into evidence as neither gun was the gun used to kill Warden. The trial judge was of the belief that the evidence would be connected up, however later in the trial the theory of the prosecution was rejected. The judge instructed the jury on the matter as follows:

''Your [sic] are further instructed that neither of the guns found upon the person of defendant WILLINGHAM and upon the person of defendant PETERS in Del Rio, Texas, have been admitted into evidence as having been allegedly used in the incident of April 24, 1967. Nor does the mere possession of these weapons by these two defendants add any probative value in any way as to the guilt or innocence of these defendants in the instant case. You are therefore admonished to completely disregard the fact of these weapons and to put the fact of these weapons out of your minds in considering your verdict as to the guilt or innocence of these two defendants upon the charges for which they are now on trial in this court.'' In this case the evidence of guilt is overwhelming and crystal clear, it is apparent that there was no deliberate and flagrant misconduct by the prosecutor with reference to the weapons found on appellants (there was nothing untruthful presented or inferred) nor was any undue advantage attempted or secured. Under the circumstances of this case we are persuaded that the instruction cured any such error. We assume that the jury followed the instruction. (See *Spencer* v. *Texas*, 385 U.S. 554, 562 [17 L.Ed.2d 606, 613, 87 S.Ct. 648].)

Appellants place great reliance upon what is said in *People* v. *Sawyer*, 256 Cal.App.2d 66 [63 Cal.Rptr. 749] to the effect that it was error to elicit testimony about the guns that were not used to kill Warden, but they overlook the fact apparently that in *Sawyer* there was no instruction given which cured the error as in this case.

█ Peters asserts further that it was prejudicial to cross-examine him with reference to any employment prior to the killing and attempted robbery. Peters testified on direct examination that in April of 1967 he had registered with the State Department of Employment in Compton, that he had assisted a person in the repossession of automobiles (although he was not directly employed or licensed to do such), that he was not "strapped for funds" and that he "had enough money to live on." On cross-examination Peters was asked where he had been last regularly employed before April 24. Peters responded in general by stating that until the middle of March 1967 he had worked five days a week for the State of California doing landscaping in and around the Salinas area. The record does set forth that out of the presence of the jury counsel for Peters indicated to the judge that Peters had been in custody until the middle of March. It was not brought out to the jury that Peters had been in custody until his release date in March. It was material to know whether under the circumstances that Peters was in need of funds and a job. Peters had stated that he was not strapped and had enough money to live on—the prosecutor was simply trying to ascertain where he got the money. (See *People* v. *Bigelow*, 165 Cal.App.2d 407, 418 [332 P.2d 162].)

█ Willingham contends that the prosecutor was guilty of prejudicial misconduct when in argument to the jury the prosecutor said:

"This is an important case and these are dangerous men and they shouldn't be on the street running around because Peters will kill somebody and has, . . ."

"[T]hey must be convicted because these men are dangerous, dangerous . . . ."

"Now before I begin, I want you to understand that I don't have any personal interest in this case and I don't run the gas station and I don't operate a small store and I don't clerk in a liquor store so these men don't prove to me the greatest risk that they might to others."

█ There was no objection to the comments during the argument. It is too late to object at this time. (*People* v.

*Perryman,* 250 Cal.App.2d 813, 819 [58 Cal.Rptr. 921].)

■■■ But even assuming that an objection had been made it is clear that the prosecutor was expressing a reasonable interpretation of the evidence. It was appropriately stated in *People* v. *Seach,* 215 Cal.App.2d 779, 784 [30 Cal.Rptr. 499] :

''In his argument to the jury the prosecutor made statements to the effect that the evidence which had been produced established the guilt of the defendants. This was followed by suggestions that if the jury should acquit, acting upon the assumption that the defendants, having had to stand trial, had been punished enough, this could encourage them in the commission of further and continued coin box burglaries. This statement is urged as prejudicial misconduct. We do not so regard it.

''While it has been held improper to suggest to a jury that neighbors, friends or the public will criticize its members if a verdict of acquittal is given [citation], it has been held proper to inform jurors that crime, due to lax administration of justice, is on the increase and that it is the duty of the jury to do its duty. [Citations.] There is a case [citation] holding that the warning to a jury of the probable consequences of a failure to convict is improper. There is no statement in the opinion of that case of just what the warning to the jury had been. The court, moreover, held that an admonition by the court to the jury had cured the error. Here we think the statement was not intended, and could not be construed, as a means either to intimidate the jury or to induce a conviction by improper means. It was essentially a reminder to the jury that if guilt was established it was its duty to convict. So construed it is a truism. 'The argument of the district attorney, particularly his closing argument, comes from an official representative of the People. As such, it does, and it should, carry great weight. It must, therefore, be reasonably objective.' [Citation.] But courts, although always solicitous to preserve the jury against improper persuasion by the prosecution, should not carry protection to the point of absurdity.''

■■■ Willingham prior to trial requested a severance from Peters. The request was denied. Section 1098, Penal Code, provides:

''When two or more defendants are jointly charged with any public offense, whether felony or misdemeanor, they must be tried jointly, unless the court order separate trials. In ordering separate trials, the court in its discretion may order a separate trial as to one or more defendants, and a joint trial as to the others, or may order any number of the defendants

to be tried at one trial, and any number of the others at different trials, or may order a separate trial for each defendant; provided, that where two or more persons can be jointly tried, the fact that separate accusatory pleadings were filed shall not prevent their joint trial.''

Willingham gave as his only reason at the time of the request that there might be an *Aranda* problem (*People* v. *Aranda*, 63 Cal.2d 518 [47 Cal.Rptr. 353, 407 P.2d 265]). There was no reference to any claim of identification. At this time Willingham asserts in effect that there was an identification problem, that Peters was positively identified as being the person who fired the shots into Warden and that there was some doubt as to whether he was with Peters. Willingham has misread the evidence, for his identification was certain and sure.

This court will not ordinarily disturb the exercise of a sound discretion by the trial judge under circumstances as they exist in this case. (*People* v. *Clark*, 62 Cal.2d 870, 883 [44 Cal.Rptr. 784, 402 P.2d 856]; *People* v. *Gant*, 252 Cal. App.2d 101, 112 [60 Cal.Rptr. 154].)

Finally, Willingham asserts that it was reversible error in not defining what constituted ''a felony inherently dangerous to human life.'' The court gave CALJIC (Rev.) which uses the phrases ''a felony inherently dangerous to human life'' in defining implied malice. Here the appellants on sufficient evidence were found guilty of attempted robbery and murder in the first degree under the felony-murder rule. Malice is not an essential element under the felony-murder rule. See *People* v. *Lookadoo*, 66 Cal.2d 307, 314-315 [57 Cal. Rptr. 608, 425 P.2d 208], where the court said:

''Under the felony-murder rule of section 189 of the Penal Code, a killing committed in the perpetration of, or attempt to perpetrate, arson, rape, robbery, burglary, mayhem, or any act punishable under section 288 is murder of the first degree. This is true whether the killing is wilful, deliberate, and premeditated or merely accidental and whether or not the killing is planned as a part of the commission of the robbery. [Citations.]

''Even independent of the felony-murder rule, however, the first degree murder conviction finds adequate support in the theory that defendant committed a deliberate and premeditated killing.''

There is no merit to any of the contentions of the appellants or of either of them.

The attempted appeal by Willingham from the order denying his motion for a new trial is dismissed.

The judgments are and each of the same is affirmed.

Lillie, J., and Thompson, J., concurred.

Appellants' petitions for a hearing by the Supreme Court were denied June 4, 1969.