[Crim. No. 7236. In Bank. June 18, 1963.]

THE PEOPLE, Plaintiff and Respondent, v. OSCAR SHIPP, Defendant and Appellant.

Burton Marks, under appointment by the Supreme Court, for Defendant and Appellant.

Stanley Mosk, Attorney General, William E. James, Assistant Attorney General, and Jack E. Goertzen, Deputy Attorney General, for Plaintiff and Respondent.

TRAYNOR, J.—Oscar Shipp and La Verne Jones were found guilty of the robbery of Bernard Wilkinson (Count I) and the robbery and first degree murder of Albert Hawley (Counts II and III). For the murder of Hawley the jury fixed the penalties as death for Shipp and life imprisonment for Jones. Jones does not appeal. Shipp's appeal is automatic. (Pen. Code, § 1239, subd. (b).)

The defendants and both victims were residents of the President Hotel in Los Angeles. Late in the evening on December 30, 1961, two men assaulted and robbed Wilkinson in his room.

He was unable to identify his assailants. He testified that he was beaten unconscious, that he suffered three broken ribs and numerous cuts and bruises on his face, that between $7.00 and $8.00 were taken from his person, and that a cigarette lighter was taken from his room.

Hawley occupied a room one floor above Wilkinson's. The hotel manager found him there on the morning of December 31, and observed that his face was bloody. The manager asked, "Who done it?" and Hawley replied, "Two white men." The police were called, and Officer Hickey was the first to arrive at the hotel. He testified that Hawley's room was disarranged and that Hawley's face was bloody and his shirt open. Officer Hickey saw a foot impression on Hawley's chest. A pocket was ripped from his trousers.

Hawley told Officer Hickey that during the night someone knocked at his door and said "This is the management." As he opened the door two men pushed in, knocking him down. They beat him on the head and body and kicked him numerous times. Hawley said that ten cents was taken from him. When asked who had done it, he said, "Two white men." After Hawley was taken to the hospital, Officer Hickey asked him for a further description, and Hawley said, "I don't really know. I didn't see them."

Hawley died on January 5, 1962. Dr. Kade, the autopsy surgeon, testified that the autopsy revealed over 20 rib fractures, three fractures of the sternum, a fractured vertebra, pulmonary contusions, hemorrhage inside the chest, extensive discoloration across the front and sides of the chest, and various head, face, and lower body injuries. It was Dr. Kade's opinion that the fractures caused terminal bronchial pneumonia and resulted in Hawley's death. He stated that the pattern of the fractures indicated that Hawley's rib cage collapsed from a crushing force exerted on the front of his chest. In Dr. Kade's opinion Hawley was lying on his back on a flat surface when the force was exerted, and was struck several blows on the chest with a heavy flat object.

Shipp and Jones were arrested on January 2. On January 8 they were taken to a room in the hall of justice, where they made voluntary statements to the police. Recordings of those statements were made without defendants' knowledge and were received in evidence at the trial. Jones gave the following account:

He and Shipp were in the lobby of the President Hotel on

the night of December 30, 1961. They saw Wilkinson enter the hotel and board the elevator. They ran up the stairs to the third floor and went to Wilkinson's room. They unlocked the door with a master key that Shipp was carrying. When Wilkinson entered, Jones hit him. He found 90 cents in Wilkinson's pocket, which he took. Wilkinson began to struggle, and Jones hit him again. He searched the room and found some hair oil and a cigarette lighter. He hit Wilkinson again. Shipp then hit Wilkinson "a couple of times more" and they left.

On Shipp's suggestion they went to Hawley's room on the fourth floor. The master key would not open the door. They knocked, and Shipp said, "This is Eddy the guy downstairs." (Eddy was the night clerk of the hotel.) They heard a voice in the room, but the door was not opened, and they broke in. Shipp grabbed Hawley, and Jones attempted to close the door. The door would not latch. At that point Jones heard someone in the hall, and then felt someone push on the door. Jones held the door with his foot and hands. The person in the hall left, and Jones was able to latch the door. When Hawley made a noise, Jones told Shipp to keep him quiet. Jones then noticed that Shipp had his arm around Hawley's neck and that Hawley was bleeding from one ear. Jones ripped a pocket from Hawley's trousers and took his wallet. Shipp and Jones searched the closet and found nothing. When Hawley again made a noise, Shipp "went back over there and held him down and shut him up with his hand over his mouth or something." Jones then searched the dresser, under the bed, and under the mattress while Shipp held Hawley. Jones believed that Shipp struck Hawley once with his fist.

Shipp and Jones then went to Jones' room on the third floor. They looked in the wallets (Jones believed there were two) and found nothing. Shipp said, "I'm going back upstairs because I think maybe we missed something." Shipp left, and Jones went to bed.

At the conclusion of his statement, Jones said that on the night of the robberies Shipp wore a light jacket and a light shirt. He noticed blood on the sleeve of the jacket and warned Shipp to get rid of it.

Shipp denied returning to Hawley's room, and then said, "The other night of the robbery, the first man Barney [Wilkinson]—it was all like Verne [Jones] said." Shipp

admitted committing both robberies with Jones and agreed with Jones' account of them, except that he denied striking Hawley. He denied kicking Hawley. He could not remember whether he had worn a jacket or just a white T-shirt. When asked about blood found on his shoe, he stated, "Now, like I said, it had to have come from the fourth floor, it had to. That's the only possible way the blood could have gotten on the shoes." He stated that he tried to get the wallet out of Hawley's pocket, "but Verne pulled this thing off."

Jones' palm print was found on the inside of the door to Hawley's room on January 2. When Shipp was arrested a jacket was found in his closet. The jacket and one of Shipp's shoes were stained with what appeared to be blood. A key was among Shipp's belongings at the county jail. Officer Seret took the key to the President Hotel and found that it unlocked the door to Wilkinson's room, but not the door to Hawley's room.

Officer Rodney testified for the prosecution that on January 11, 1962, he searched the room that Shipp had occupied and found a journal and two Coast Federal Savings passbooks behind a refrigerator. Another witness identified handwriting on the journal as Hawley's, and testified that Hawley had an account at Coast Federal Savings. On cross-examination Officer Rodney admitted that he had made an investigation report concerning his "activities in the case." Shipp's motion for production of the report for the purposes of impeachment was denied.

■ We agree with Shipp's contention that it was error to deny production of Officer Rodney's report. A sufficient foundation for production was laid by showing that the witness had made a report relating to matters covered in his testimony. (*People* v. *Estrada,* 54 Cal.2d 713, 716 [7 Cal. Rptr. 897, 355 P.2d 641]; *Funk* v. *Superior Court,* 52 Cal.2d 423 [340 P.2d 593]; *People* v. *Chapman,* 52 Cal.2d 95, 98-99 [338 P.2d 428].)

In deciding whether this error was prejudicial, we must determine whether there was a reasonable probability that the jury would have reached a different verdict had the report been produced. (*People* v. *Riser,* 47 Cal.2d 566, 588 [305 P.2d 1].) Since we do not know the contents of the report, we must assume that production would have enabled Shipp to impeach Officer Rodney and thereby neutralize his testimony. The issue, therefore, is whether it is reasonably probable that

the verdict would have been different had Officer Rodney's testimony been excluded.[1]

Officer Rodney's testimony tended to prove that Shipp robbed Hawley. It is not reasonably probable, however, that the jury's conclusion on that issue would have been different without Officer Rodney's testimony. Shipp admitted that he committed the robbery, and the evidence corroborating that admission is overwhelming.

Officer Rodney's testimony also tended to discredit Shipp's testimony, because it contradicted Shipp's claim that he knew nothing about the passbooks and journal. Shipp's testimony, however, was contradicted by other evidence. He denied telling Jones that he would get rid of his jacket. Jones testified to the contrary. Shipp denied that he ever intended to rob Hawley, though he admitted that he broke into Hawley's room, that he held his hand over Hawley's mouth while Jones searched the room, and that when he left the room Hawley was lying on the floor and bleeding from the ear. He testified that the blood on his jacket and shoe came from a fight he had been in before the robberies. When asked why he had previously stated that the blood must have come from the fourth floor, he explained that the fight occurred on the fourth floor. He claimed that he mentioned the fight during his recorded statement, and theorized that it was not recorded because the recorder was turned off. Officer Benson testified that the recorder was not turned off at any time during the taking of the statements and that the tape accurately and fairly reflected what was said.

Shipp's testimony was not only contradicted, but was inconsistent with his recorded statement and with Jones' statement, which Jones repeated on the stand. Shipp denied that Hawley's door had been latched or that he had said he was Eddy. When confronted with his recorded statements to the contrary,

---

[1]It appears that this evidence might have been excluded on another ground. Shipp's objection to the admission of the passbooks and journal on the ground they were obtained by an illegal search was overruled. Officer Rodney admitted that he did not have a warrant for the search of Shipp's room. The prosecution then had the burden of showing justification. (*Priestly* v. *Superior Court*, 50 Cal.2d 812, 816 [330 P.2d 39].) Officer Rodney testified that at the time of the search the room was "vacant," and that a janitor was present during the search. Although it might be inferred that at the time of the search the room had no tenant and that the hotel management consented to the search, the evidence to that effect is ambiguous. Under the circumstances the prosecution could have made a clear showing of a valid consent, if in fact the room had no tenant and the hotel management had authorized the search.

he explained that his prior statements were lies. He denied trying to get the wallet from Hawley's pocket, but did not explain why he had admitted doing so in his recorded statement. He denied that he saw Jones take Hawley's wallet, though he had previously admitted seeing Jones rip off the pocket from which Shipp had attempted to remove the wallet.

In view of these contradictions and inconsistencies and the implausible explanations offered by Shipp, it is not reasonably probable that without Officer Rodney's testimony the jury would have believed Shipp's testimony. Nor is it reasonably probable that without Officer Rodney's testimony the jury would have found Shipp innocent of the beating that caused Hawley's death. Since Jones denied any knowledge of the passbooks and journal, the finding of that property in Shipp's room tended to prove that Shipp alone made a second visit to Hawley's room. Had that evidence been excluded, it is possible that the jury would have concluded that Shipp did not return to Hawley's room. It is not reasonably probable, however, that this conclusion would have led the jury to then conclude that Shipp did not inflict the fatal beating.

Shipp admitted beating and robbing Wilkinson. He admitted going to Hawley's room immediately thereafter. It was his task to keep Hawley quiet, and he accomplished a similar task by beating Wilkinson. Three times Hawley made a noise and was quieted by Shipp. Jones denied seeing Shipp kick Hawley, but he was holding the door and searching the room and could not have seen everything Shipp did. He testified that he saw Shipp strike Hawley with his fist and hold an arm around Hawley's neck and a hand over his mouth. When Jones left the room, he saw that Hawley was lying on the floor and moaning. Blood was coming from Hawley's ear. Shipp's jacket and shoe were stained with blood. Hawley stated that the two men who robbed him also struck him and kicked him numerous times. His description of the way his assailants broke into his room was substantially similar to that given by Shipp and Jones in their recorded statements and by Jones' testimony.

It is true that Hawley identified his attackers as "two white men," and that Shipp and Jones are Negroes. He later admitted, however, that he did not see them and did not really know. Moreover, Shipp and Jones admit that they attacked and robbed Hawley. Hawley was conscious and unhurt when they broke into his room. Hawley did not say

that two separate pairs of men broke into his room. If there was a second pair, Hawley was apparently not conscious of them.

It is possible that Hawley was assaulted by two white men after Shipp and Jones left his room. It is possible that Hawley was conscious and saw them but believed that they were the same men who had robbed him. These possibilities, however, are not materially reduced by Officer Rodney's testimony. We do not believe that the exclusion of his testimony would have made it more likely that the jury would believe that after Shipp and Jones left Hawley's room two other men entered and inflicted the fatal injuries.

■ At the beginning of the trial it was established that Shipp was 19 years of age. His motion for certification to the juvenile court was denied. Shipp contends that certification was mandatory under section 604, subdivision (b), of the Welfare and Institutions Code, which provides: "Whenever a case is pending in any court upon an accusatory pleading and it appears to the satisfaction of the judge that the person charged is under the age of 21 years, the judge *may* certify the case to the juvenile court in his county in the manner prescribed by subdivision (a) of this section." (Italics added.) Subdivision (a) provides that if the defendant is under the age of 18 years the trial judge must suspend proceedings and certify the defendant to the juvenile court.

Subdivision (b) gives the trial court discretion to deny certification if the defendant is from 18 to 20 years of age. Shipp contends, however, that unless the word "may" in subdivision (b) is construed as "must," the provision is "unconstitutionally vague" and denies equal protection of the laws because it contains no standards to guide the trial judge in exercising his discretion. This contention is without merit. Subdivision (b) does not authorize the trial judge arbitrarily or capriciously to grant or deny certification to the juvenile court. Even though the statute contains no express standards, the trial judge must exercise his discretion reasonably and in furtherance of justice. (Cf. *Ordway* v. *Arata,* 150 Cal.App.2d 71 [309 P.2d 919] [Code Civ. Proc., § 583]; *Georgison* v. *Georgison,* 43 Cal.2d 550 [275 P.2d 3] [Code Civ. Proc., § 685]; *National Electric Supply Co.* v. *Mt. Diablo Unified School Dist.,* 187 Cal.App.2d 418 [9 Cal.Rptr. 864] [Code Civ. Proc., § 1048]; *People* v. *Romero,* 156 Cal.App.2d 48, 51 [318 P.2d 835] [Code Civ. Proc., § 2042]; *In re Newbern,* 55 Cal.2d 500, 503-504 [11 Cal.Rptr. 547, 360 P.2d 43] [Pen. Code, § 1272].)

By implication section 604 requires the trial court to exercise its discretion to serve the purposes of the Juvenile Court Law. (Cf. *In re Petersen,* 51 Cal.2d 177, 185 [331 P.2d 24, 77 A.L.R. 2d 1291]; *People* v. *Barnett,* 27 Cal.2d 649, 656 [166 P.2d 4].)

■ The trial court did not abuse its discretion in refusing to certify Shipp to the juvenile court. The nature of the charges against him justifies the conclusion that he was not a fit subject for consideration in the juvenile court. (See Welf. & Inst. Code, § 606; *People* v. *Yeager,* 55 Cal.2d 374, 389 [10 Cal.Rptr. 829, 359 P.2d 261].)

■ The trial court did not err in excusing prospective jurors conscientiously opposed to the death penalty. ( *People* v. *Love,* 56 Cal.2d 720, 726 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809]; *People* v. *Duncan,* 53 Cal.2d 803, 816 [3 Cal.Rptr. 351, 350 P.2d 103]; *People* v. *Riser,* 47 Cal.2d 566, 575-576 [305 P.2d 1], cert. denied, 353 U.S. 930 [77 S.Ct. 721, 1 L.Ed.2d 724].) It is immaterial that the trial court excused the jurors on its own motion. It was required to examine the prospective jurors. (Pen. Code, § 1078.) When that examination revealed the jurors' conscientious objections, it was the trial court's duty to excuse them. (Cf. *People* v. *Goldenson,* 76 Cal. 328, 346 [19 P. 161].)

■ At the trial Shipp moved that the issues of guilt and penalty be tried together. The motion was denied under section 190.1 of the Penal Code. Shipp contends that section 190.1 was enacted for the benefit of defendants and therefore can be waived. He further contends that if it cannot be waived it is unconstitutional. These contentions are without merit. The provisions of section 190.1 establishing the bifurcated trial are mandatory, and their constitutionality is settled. (*People* v. *Love,* 56 Cal.2d 720, 725 [16 Cal.Rptr. 777, 17 Cal.Rptr. 481, 366 P.2d 33, 809]; *People* v. *Corwin,* 52 Cal. 2d 404, 407 [340 P.2d 626]; *People* v. *Duncan,* 51 Cal.2d 523, 529 [334 P.2d 858]; *People* v. *Feldkamp,* 51 Cal.2d 237, 240-241 [331 P.2d 632]; *People* v. *Ward,* 50 Cal.2d 702, 706-711 [328 P.2d 777, 76 A.L.R.2d 911]; *Ward* v. *State of California* (9th Cir. 1959) 269 F.2d 906.)

■ During argument on the penalty counsel for Shipp argued that the death penalty is not morally permissible in any case. In support of this argument he attempted to read a newspaper article that apparently reported an attempt to abolish the death penalty in the Legislature. Shipp contends that the trial court erred in refusing to permit the reading of the article to the jury.

Counsel's argument was improper. The choice between the death penalty and life imprisonment is within the discretion of the jury. (Pen. Code, § 190.) "General views of the social desirability or moral permissibility of capital punishment could logically have no place among the factors influencing the exercise of a discretion so conceived." (*People* v. *Riser*, 47 Cal.2d 566, 575 [305 P.2d 1].) By arguing that capital punishment is not proper in any case, counsel in effect urged the jury to disregard the Legislature's determination to the contrary. Moreover, the newspaper article had not been introduced in evidence, nor did it state matters of common knowledge of which the jury could take judicial notice. (See *People* v. *Love*, 56 Cal.2d 720, 730-732 [16 Cal.Rptr. 177, 17 Cal.Rptr. 481, 366 P.2d 33, 809].)

There is no merit in the contention that the trial court committed prejudicial error in several rulings on evidence.

The judgment on each count is affirmed.

Gibson, C.J., Schauer, J., McComb, J., Peters, J., Tobriner, J., and Peek, J., concurred.

Appellant's petition for a rehearing was denied July 17, 1963.