[Crim. No. 4814. First Dist., Div. One. Feb. 24, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. JOHN LEE KING and ROBERT LEE JONES, Defendants and Appellants.

Thomas R. Williamson and David B. Flinn, under appointment by the District Court of Appeal, for Defendants and Appellants.

Thomas C. Lynch, Attorney General, and Edward P. O'Brien, Deputy Attorney General, for Plaintiff and Respondent.

SULLIVAN, P. J.—A jury found defendants John Lee King and Robert Lee Jones guilty of murder in the first degree (Pen. Code, §§ 187, 189)[1] and of robbery in the first degree (§§ 211, 211a) and fixed the penalty on the murder count at life imprisonment (§ 190).[2] Defendants' motions for new trial

---

[1] Hereafter, unless otherwise stated, all section references are to the Penal Code.

[2] King and Jones were charged in count one of the indictment with the murder (§ 187) of Donald G. Corbett, Jr., on or about March 27, 1964; in count two Jones was charged with grand theft (§ 487) committed on March 11, 1964; in count three King was charged with armed robbery (§ 211) of Charles Frederick committed on or about March 14, 1964; in count four King was charged with kidnaping (§ 209) of Frederick committed on or about March 14, 1964; in count five King was charged with armed robbery (§ 211) of Clifford Ray Hutchinson committed on or about March 14, 1964; and in count six King and Jones were charged with armed robbery (§ 211) of Sylvester Schladweiler committed on or about March 25, 1964. Eventually motions for sever-

were denied and defendants were sentenced on the murder count (Count One) to life imprisonment and on the robbery count (Count Two) to state prison for the term prescribed by law, such sentences to run concurrently. They appeal from the judgments of conviction.[3]

Since defendants do not question the sufficiency of the evidence to support the convictions, our recital of the facts will avoid unnecessary detail. In our separate consideration of the several issues, we will set forth such additional facts pertinent to each as the discussion may require.

### The Robbery (Count Two)

On March 25, 1964, at about 10:30 p.m., defendant King entered a liquor store in Mill Valley and asked for cigarettes. After receiving them, King ordered the store owner, Schladweiler, to open the cash register, at the same time producing a Colt automatic. Schladweiler complied and King scooped out all the currency. Jones then entered the store, telling King to "Get it all." Schladweiler was then forced to hand over $125 in dollar bills and some rolled coins which were underneath the counter. Defendants then made their get-a-way in a late model automobile.

### The Murder (Count One)

On Monday, March 30, 1964, the day after Easter, the body of the victim Donald Corbett, a young business executive, was found in his apartment in Sausalito. On the preceding Thursday evening he had been seen with defendant King at Zack's Restaurant in Sausalito. On the next day, Good Friday, Corbett lunched with a few friends and business associates at Zack's, leaving them about 2:30 p.m. Later in the afternoon, accompanied by a young lady next door neighbor, he drove in his Porsche automobile to a nearby beach, returning to his apartment at about 6:30 p.m.

On the same day (March 27, 1964) between 7 p.m. and 8:45 p.m., Corbett's divorced wife, a resident of Tucson, Arizona, tried to reach him by long distance telephone, but without success. All three calls were answered by the same male voice:

ance of counts two through five from counts one and six were granted and the cause proceeded to trial before a jury on counts one (murder) and six (robbery), thereafter and herein referred to as counts one and two respectively.

[3]Defendant King also appealed from the order denying his motion for a new trial. Such order is not appealable and the attempted appeal therefrom must be dismissed. (Pen. Code, § 1237; *People* v. *Justice* (1963) 211 Cal.App.2d 660, 662 [27 Cal.Rptr. 465].)

she was first told that Corbett was out and on her last attempt that he had gone "into the city." The person answering them identified himself as Jack Nielsen. Mrs. Corbett came to Sausalito, went to Corbett's apartment on Sunday, March 29, at about 8 p.m., and finding no one there left a note for Corbett with a neighbor. She telephoned Corbett many times on Sunday from San Francisco but could get no answer. A lady friend of Corbett's also tried to contact him by telephone on Friday evening, Saturday afternoon and Sunday. Her Friday call, made at about 9 p.m., was answered by a man who told her that Corbett was in the city and would not return until 3 a.m.; her other calls received no response. Corbett's brother was also unsuccessful in telephoning Corbett during Saturday afternoon and evening and throughout Sunday.

On Monday, March 30, 1964, between 11 and 11:30 a.m., three of Corbett's friends, concerned over his nonappearance at work, gained entrance to his apartment and found his body. One of them noticed that the paintings which he had seen there on the preceding Friday were missing. There was testimony by a pathologist who examined the victim's body that the cause of death was hemorrhage caused by 16 stab wounds in the back made by a sharp instrument such as an ice pick, a nail or a knitting needle. There were also injuries to the victim's head, including a depressed skull fracture, a fracture of the nose and a blackened left eye. The medical witness fixed the time of death at "around 48 hours prior" to the autopsy which he performed at 5 p.m. on Monday.

Defendants had been in the Sausalito area since March 1964 and were frequently seen together, although known by other names. On March 5 they rented a houseboat named "Julia," King introducing himself as Jack Carpenter and Jones as Virgil Stevens. Both said they were employees of the General Electric Company. On March 18th, King rented an apartment on the houseboat "Surfside I," using the name Carpenter; he left the "Julia" and occupied the new apartment by himself. Defendants were known to have been in the possession of guns and had once been overheard arguing about guns by King's neighbors on the "Surfside I."

On March 27, 1964 (Good Friday), about noon, defendant King discussed with a local boat builder the possible purchase of an expensive sailboat and also disclosed to other persons his intention to purchase a Porsche automobile and a stereo set as well as the boat. That night both defendants were seen returning to the Julia together at about 10:30 p.m. and leaving the houseboat again around 11:30 p.m.

An hour or so later their paths crossed that of Arlene Walsh who had known Jones under the name of Virgil Stevens for about a week and had had several dates with him. When Mrs. Walsh returned to her apartment shortly after midnight, she found Jones waiting in her bedroom. The two then went in Jones' Pontiac to Zack's Bar in Sausalito where they arrived at about 1 a.m. on Saturday, March 28. They met King inside, who was thereupon introduced by Jones to Mrs. Walsh as Jack Carpenter. King was intoxicated and obnoxious. Jones proceeded to take Mrs. Walsh home and King followed them to the parking lot. There the three of them entered a "metallic gold" Porsche, which Jones drove to Mrs. Walsh's apartment. Eventually the two men stayed there all night, leaving about 10:30 a.m. Defendants returned to the apartment at about 1 p.m. and drove Mrs. Walsh in the Porsche to their houseboats where she remained until 4 p.m. aboard the Julia while Jones left with King who, she was told, "had business in the city." After a short visit to the other houseboat, Jones drove Mrs. Walsh home at about 4:30 p.m. When she left, she saw King putting suitcases in the Porsche.

During this sequence of events, another significant incident took place. On Saturday morning, before defendants returned from Mrs. Walsh's apartment, the owner of the "Surfside I" had gone to that houseboat to see if it had been damaged by a tidal wave which had struck the area during the night and had entered King's apartment. In the course of an inspection of the boat by the owner and others accompanying him, a number of articles belonging to Corbett, the victim, were seen in King's apartment.[4] King found the visitors there on his return with Jones later in the morning, became "slightly upset" and told the owner to "Get out of here."

On the same day, Saturday, March 28 at 5 p.m., defendants rented a Lincoln convertible in San Francisco, King signing the rental agreement as Donald Corbett and charging the bill on Corbett's American Express card. On Sunday, March 29, 1964, at 1:45 a.m., defendants arrived in the Lincoln at the Mapes Hotel in Reno, Nevada, and registered as guests, King, the driver, using the name of Corbett. The luggage which they had was Corbett's. On Sunday, March 29, defendants drove to

---

[4]On April 2, 1964, pursuant to a search warrant, officers entered King's apartment and seized the following: two paintings belonging to Corbett, his camera, an initialed box, initialed jewelry and towels, Corbett's wallet, his file box and a bag containing his personal items. Also found therein was an ice pick with blood on the handle.

Las Vegas where they registered at a motel at 10 p.m. There they abandoned the Lincoln. In the car sheriff's officers found the keys to Corbett's Porsche. From Las Vegas defendants went by plane to Los Angeles, then to Miami Beach; and finally by way of New Orleans and Los Angeles to Honolulu.[5]

Early in the morning of April 5, 1964, defendant King was apprehended by the agents of the Federal Bureau of Investigation in a hotel on the island of Hawaii where he had registered under the name of Corbett. After being advised of his right to counsel and to remain silent, King talked to the agents about his travel activities and his use of Corbett's name. He told them that he had never met Corbett "when he was alive." Later that morning, F.B.I. agents apprehended defendant Jones in a nearby hotel. After advising the latter of his rights, they searched the hotel room, uncovering personal effects of Corbett's, weapons and ammunition, and rolls of coins which had been taken in the robbery of the Mill Valley liquor store.

The prosecution called Evelyn Money who testified that while she was living in Houston, Texas, in the early part of March 1964 she met both defendants; that they brutally assaulted her in her apartment, bound her with adhesive tape and threatened her life; and that they stole her Pontiac automobile, the same car defendants had in Sausalito, as well as other personal property.

Neither defendant took the stand in his own behalf. King called one witness in defense; Jones called none.[6]

Defendants are represented on this appeal by separate counsel appointed by this court, who were not their counsel in the court below. Separate briefs have been filed on behalf of each. King makes six contentions before us for reversal of the judgment; Jones makes four contentions which are identical to four of those made by King. Hereafter in our discussion of the several points we indicate whether they are raised by King alone or by both defendants.

Defendant King alone contends that it was error for the trial court to exclude prospective jurors who indicated

[5]Discovered in a Los Angeles hotel, having been checked there by defendant King, were a cardboard carton and a black suitcase, both belonging to Corbett. Contained therein, in addition to many of the victim's personal effects, were several component parts of a gun, a box of automatic shells, and a partially used roll of adhesive tape, the torn end of which corresponded with the torn end of one of the tapes removed from the victim.

[6]Both defendants called witnesses at the subsequent trial on the issue of penalty on the murder count.

upon *voir dire* examination that they were unequivocally opposed to the death penalty.

Section 1074 provides in relevant part: "A challenge for implied bias may be taken . . . 8. If the offense charged be punishable with death, the entertaining of such conscientious opinions as would preclude his finding the defendant guilty; in which case he must neither be permitted nor compelled to serve as a juror."

█ "It has been held in numerous cases that where the death penalty may be imposed a prosecutor has the right to ascertain the views of prospective jurors on capital punishment, so that he can intelligently exercise his challenges against jurors whose consciences would preclude them from imposing the death penalty, and it is proper for the court to excuse jurors conscientiously opposed to capital punishment." (*People* v. *Mitchell* (1964) 61 Cal.2d 353, 365 [38 Cal.Rptr. 726, 392 P.2d 526]; *People* v. *Spencer* (1963) 60 Cal.2d 64, 75 [31 Cal.Rptr. 782, 283 P.2d 134], cert. denied 377 U.S. 1007, [84 S.Ct. 1924, 12 L.Ed.2d 1055]; *People* v. *Ketchel* (1963) 59 Cal.2d 503, 529[7] [30 Cal.Rptr. 538, 381 P.2d 394]; *People* v. *Shipp* (1963) 59 Cal.2d 845, 853 [31 Cal. Rptr. 457, 382 P.2d 577], cert. denied 377 U.S. 999 [84 S.Ct. 1927, 12 L.Ed.2d 1049]; *People* v. *Pike* (1962) 58 Cal.2d 70, 87 [22 Cal.Rptr. 664, 372 P.2d 656], cert. denied 371 U.S. 941 [84 S.Ct. 324, 9 L.Ed.2d 277].) █ Contrary to defendant's claim, section 1074, subdivision 8, was not abrogated, either expressly or by implication, as a result of the enactment in 1957 of section 190.1 providing for a separate trial on the penalty issue in capital cases. The reason for the exclusion from the jury of persons with views opposed to capital punishment has been stated thusly: that permitting them to serve "would in all probability work a de facto abolition of capital punishment" (*People* v. *Riser* (1956) 47 Cal.2d 566, 576[8] [305 P.2d 1]) and that "Such views should not obviate a meaningful choice between the alternative penalties of death and life imprisonment" (*People* v. *Ketchel, supra,* 59 Cal.2d 503, 529). This fundamental reason, proclaimed in a number of decisions, does not dissolve in the light of section 190.1. Under that section the issue of penalty shall be tried by "the same jury unless, for good cause shown, the court discharges

---

[7]Overruled on other grounds in *People* v. *Morse* (1964) 60 Cal.2d 631, 648-649 [36 Cal.Rptr. 201, 388 P.2d 33].

[8]Overruled on other grounds in *People* v. *Morse* (1964) 60 Cal.2d 631, 648-649 [36 Cal.Rptr. 201, 388 P.2d 33].

that jury. . . ." Indeed, the rule set forth in *People* v. *Mitchell, supra,* and other cases referred to above implements section 1074 in the light of section 190 as amended (*People* v. *Spencer, supra,* 60 Cal.2d 64, 75, fn. 3) and thus in the light of section 190.1 enacted simultaneously with such amendment.[9]

The trial court acted properly in excluding the prospective jurors upon ascertaining their conscientious objections to capital punishment. Furthermore, defendant King is in no position to complain of the court's action since he was not given the death penalty. (*People* v. *Pike, supra,* 58 Cal.2d 70, 85, fn. 7.)

Both defendants contend that section 1070.5[10] which prescribes the number of peremptory challenges when defendants are jointly tried constitutes a deprivation of due process of law, a denial of equal protection of the law and a denial of the right of trial by jury.

Since the offense charged in Count One was punishable with death or with life imprisonment, defendants under the above section were entitled to 20 peremptory challenges which had to be exercised by them *jointly,* each defendant, however, being entitled to five additional challenges which he could exercise separately.

Defendants initially complain that as a result their right to exercise peremptory challenges is "substantially diminished" because being limited in a joint trial to only five challenges which can be separately exercised, each defendant has "lost" 15 peremptory challenges. In replacement of these 15 "lost" challenges, so the argument goes, section 1070.5 gave each defendant in the instant case 20 challenges but required the defendants to exercise them jointly. Defendants argue that

[9] Section 190 was amended in 1957 (Stats. 1957, ch. 1968, § 1, p. 3509) and at the same time section 190.1 was added to the Penal Code (Stats. 1957, ch. 1968, § 2, p. 3509). Section 190 was thus coordinated with section 190.1 to read as follows: "Every person guilty of murder in the first degree shall suffer death, or confinement in the state prison for life, at the discretion of the court or jury trying the same, and the matter of punishment *shall be determined as provided in Section 190.1,* and every person guilty of murder in the second degree is punishable by imprisonment in the state prison from five years to life." (Italics added.)

[10] Section 1070.5 provides: "When two or more defendants are jointly tried for any public offense, whether felony or misdemeanor, the State and the defendants shall be entitled to the number of challenges prescribed by Section 1070 of this code, which challenges on the part of the defendants *must be exercised jointly. Each defendant shall also be entitled to five additional challenges which may be exercised separately;* the State shall also be entitled to additional challenges equal to the number of all the additional separate challenges allowed the defendants." (Italics added.)

because their interests were opposed, they were able to agree on only five challenges and as a result received only 10 while the People, armed with *30* (§ 1070.5), obtained a jury which was "a panel of persons selected by the prosecuting attorney."

It has been said that the "peremptory challenge has very old credentials" (*Swain* v. *Alabama* (1965) 380 U.S. 202, 212 [85 S.Ct. 824, 13 L.Ed.2d 759, 768]) based upon its long history in trials for felonies at common law and its continued and indeed wide use in this country in criminal trials conducted both under our federal and state judicial systems. (*Swain* v. *Alabama, supra*, 380 U.S. 202, 213-219, 13 L.Ed.2d 759, 768-772.) All authorities agree that the peremptory challenge is a substantial right. The Supreme Court of the United States has said that "The right of challenge comes from the common law with the trial by jury itself, and has always been held essential to the fairness of trial by jury" (*Lewis* v. *United States* (1892) 146 U.S. 370, 376 [13 S.Ct. 136, 36 L.Ed. 1011, 1014]); that such right "is one of the most important rights secured to the accused" (*Pointer* v. *United States* (1894) 151 U.S. 396, 408 [14 S.Ct. 410, 38 L.Ed. 208, 214]); and more recently in *Swain* v. *Alabama, supra*, that the "persistence of peremptories and their extensive use demonstrate the long and widely held belief that peremptory challenge is a necessary part of trial by jury" (380 U.S. at p. 219, 13 L.Ed.2d at pp. 771-772). In *People* v. *Edwards* (1894) 101 Cal. 543, 544 [36 P. 7], the California Supreme Court declared: "The right of peremptory challenge is one of the chief safeguards of a defendant against an unjust conviction, and courts ought to permit the freest exercise of this right within the limits fixed by the legislature."

Notwithstanding such distinguished ancestry and respected career, neither the United States Constitution nor the Constitution of California in their respective provisions securing to the accused his right to trial by jury (U.S. Const., 6th Amend.; Cal. Const., art. I, § 7), or elsewhere, requires that Congress or the California Legislature grant peremptory challenges to the accused or prescribes any particular method of securing to an accused the right to exercise the peremptory challenges granted by the appropriate legislative body. (*Stilson* v. *United States* (1919) 250 U.S. 583, 586 [40 S.Ct. 28, 63 L.Ed. 1154, 1156]; *Frazier* v. *United States* (1948) 335 U.S. 497, 505, fn. 11 [69 S.Ct. 201, 93 L.Ed. 187, 195]; *Swain* v. *Alabama, supra*, 380 U.S. 202, 219, 13 L.Ed.2d 759, 771-772;

*Philbrook* v. *United States* (8th Cir. 1941) 117 F.2d 632, 635-636, cert. denied 313 U.S. 577 [61 S.Ct. 1097, 85 L.Ed. 1534]; *State* v. *Persinger* (1963) 62 Wn.2d 362 [382 P.2d 497, 500-501], appeal dismissed 376 U.S. 187 [84 S.Ct. 638, 11 L.Ed.2d 603]; 31 Am. Jur., Jury, § 230, p. 193; 50 C.J.S., Juries, § 280, p. 1070; see also *People* v. *Dowell* (1928) 204 Cal. 109 [266 P. 807].) The matter of peremptory challenges rests with the Legislature, limited only by the necessity of having an impartial jury. (*State* v. *Persinger, supra,* 62 Wn.2d 362, 366-367 [382 P.2d 497, 500-501]; 31 Am.Jur., Jury, § 230, p. 193.)

Thus, in *Stilson* v. *United States, supra,* the court upheld a federal statute requiring that where there were several defendants or several plaintiffs, the parties on each side should be deemed a single party for the purpose of peremptory challenges, declaring: ''There is nothing in the Constitution of the United States which requires the Congress to grant peremptory challenges to defendants in criminal cases; trial by an impartial jury is all that is secured. The number of challenges is left to be regulated by the common law or the enactments of Congress. That body has seen fit to treat several defendants, for this purpose, as one party. If the defendants would avail themselves of this privilege they must act accordingly. It may be, as is said to have been the fact in the trial of the present case, that all defendants may not wish to exercise the right of peremptory challenge as to the same person or persons and that some may wish to challenge those who are unobjectionable to others. But *this situation arises from the exercise of a privilege* granted by the legislative authority and does not invalidate the law. *The privilege must be taken with the limitations* placed upon the manner of its exercise.'' (Italics added.) (250 U.S. at pp. 587-588, 63 L.Ed. at pp. 1156-1157; see also *Schaefer* v. *United States* (1920) 251 U.S. 466, 470 [40 S.Ct. 259, 64 L.Ed. 360, 362].)

The requirement of section 1070.5 that defendants exercise their peremptory challenges jointly does not contravene the due process clauses of either the United States (U.S. Const., 14th Amend.) or California (Cal. Const., art. I, § 13) Constitution. Nor does such requirement, as defendants claim, deny them their right to trial by jury. Both the federal[11] and state[12] Constitutions guarantee defendants a right of trial by

---

[11]U.S. Const., 6th Amend., provides: ''In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury. . . .''

[12]Cal. Const., art. I, § 7 provides: ''The right of trial by jury shall be secured to all, and remain inviolate; . . .''

jury. As previously pointed out, neither constitution prescribes as part of such right the granting of peremptory challenges to the accused. It therefore cannot be said that a fair trial by an impartial jury is denied codefendants merely because the statute granting them peremptory challenges provides that they must exercise the challenges jointly. As the court said in *State* v. *Persinger, supra,* 62 Wn.2d 362, 366, "The law presumes that each juror sworn in a case is impartial and above legal exception, otherwise he would have been challenged for 'cause.' [Citation.] A peremptory challenge is not aimed at the disqualification of a juror. It is exercised upon qualified jurors who have not been excused for 'cause.' [Citations.] . . . An accused cannot complain if he is tried by an impartial jury. He can demand nothing more. If, from those who remain, an impartial jury is obtained, the constitutional rights of an accused are maintained. [Citations.]"

Defendants further complain that in the instant case each of them had only 10 peremptory challenges[13] "while any defendant tried individually would have been entitled to twenty." They argue that this distinction is "totally arbitrary" and denies them the equal protection of the law guaranteed by the Fourteenth Amendment to the United States Constitution.[14] As the Attorney General points out to us, it has been held that the statutory requirement that defendants join in peremptory challenges does not violate the Fourteenth Amendment. (*People* v. *Pilbro* (1927) 85 Cal.App. 789, 793 [260 P. 303]; *People* v. *Hodges* (1931) 116 Cal.App. 61, 76-77 [2 P.2d 174]; see *Muller* v. *Hale* (1902) 138 Cal. 163, 165 [71 P. 81] where the court held that the requirement in a civil case did not deny equal protection of the law "as the same rule applies to all the parties to an action where they are united with others, either as plaintiffs or defendants.") However, the foregoing cases appear to consider the question of reasonable classification in respect to a class of "coplaintiffs" or "codefendants" arriving at the conclusion that all codefendants are treated similarly in the joint exercise of peremptory challenges. In the case before us, however, King and Jones contend that the class discriminated against is "codefendants" as within the class of "defendants." The point

[13]In other words, the five they were able to agree upon and exercise jointly and the additional five which each could exercise separately.

[14]U.S. Const., 14th Amend., § 1 provides: "nor [shall any state] deny to any person within its jurisdiction the equal protection of the laws."

of their argument is that codefendants jointly tried, as a class, are not treated in the same manner as individual defendants separately tried, as a class. At issue then, is whether the classification is reasonable or arbitrary.

An identical argument was made in *State* v. *Persinger, supra,* 62 Wn.2d 362, to the Supreme Court of Washington which upheld a statute providing that where several defendants were tried together, they were required to join in their peremptory challenges. Rejecting the above argument, the court said: "There are equally valid reasons for discriminating between the peremptory challenges of single defendants and codefendants. Here too, the reason is based upon the different problems involved in obtaining jurors. To allow each codefendant the full number of peremptory challenges would frequently cause undue delay and needless burden upon the public. As pointed out in *State* v. *Reed* (1867) 47 N.H. 466: '. . . If ten or twenty men were indicted for a misdemeanor, like a riot, and each had his two peremptory challenges, a larger attendance of jurors would be required than in a capital trial; . . .' Other courts also have recognized that if codefendants were given the full number of personal challenges, it would not only be inconvenient, but difficult to obtain juries. In fact, it would require the presence of an impractical number of jurors. *State* v. *Sutton* (1872) 10 R.I. 159; *State* v. *Cady* (1888) 80 Me. 413 [14 A. 940]; *Schwartzberg* v. *United States* (1917) 241 F. 348. The same reasons apply here." (62 Wn.2d at p. 369.) We think that the same reasoning applies to the statute now before us and we hold that section 1070.5 does not deny the equal protection of the law to defendants jointly tried.

Furthermore, as the Attorney General points out to us, defendants failed to exercise all their peremptory challenges and passed for cause all jurors ultimately sworn to try the case. We are satisfied that the procedure followed in the trial of the instant cause did not deny or impair their constitutional right to a fair trial by an impartial jury.

It is next contended by both defendants that section 190.1, by requiring that in capital cases the separate trials on the issues of guilt and of penalty shall be had before the same jury,[15] constitutes a deprivation of due process. The argument

---

[15]Section 190.1 provides that the trier of fact on the penalty issue "shall be same jury unless, for good cause shown, the court discharges that jury in which case a new jury shall be drawn to determine the issue of penalty."

is made that since there is only one *voir dire* examination of the jury at the commencement of the trial on the guilt issue, any necessary and lengthy inquiry of the prospective jurors as to their views on capital punishment results in an emphasis tantamount to an admission of defendant's guilt.

Defendants' contention is without merit. ''The provisions of section 190.1 establishing the bifurcated trial are mandatory, and their constitutionality is settled. [Citations.]'' (*People* v. *Shipp, supra,* 59 Cal.2d 845, 853; *People* v. *Duncan* (1959) 51 Cal.2d 523, 529 [334 P.2d 858].) Furthermore, on three occasions during the *voir dire* examination the judge cautioned the prospective jurors that the questions concerning the penalty were not to be taken by them as an assumption that there *would* be a penalty trial. Towards the end of such examination counsel for defendant Jones also emphasized that proceedings on the penalty issue would be had only ''if a verdict of guilty should be brought in on the murder charge,'' that inquiry relevant to the penalty was then being made because ''we won't have another opportunity'' and that there was no ''presumption . . . that the defendants are already guilty of the charges.''

Both defendants next contend that the court committed prejudicial error in admitting in evidence certain photographs of the victim's body and certain articles of his clothing.

''Whether the probative value of photographs offered into evidence outweighs the possible prejudicial effect is a question for the trial court in the exercise of its judicial discretion. [Citations.]'' (*People* v. *Harrison* (1963) 59 Cal.2d 622, 627 [30 Cal.Rptr. 841, 331 P.2d 665]; *People* v. *Mathis* (1965) 63 Cal.2d 416, 423 [46 Cal.Rptr. 785, 406 P.2d 65]; *People* v. *Henderson* (1963) 60 Cal.2d 482, 495 [35 Cal.Rptr. 77, 386 P.2d 677]; *People* v. *Darling* (1962) 58 Cal.2d 15, 21 [22 Cal.Rptr. 482, 372 P.2d 316]; *People* v. *Love* (1960) 53 Cal.2d 843, 852 [3 Cal.Rptr. 665, 350 P.2d 705]; *People* v. *Brubaker* (1959) 53 Cal.2d 37, 48 [346 P.2d 8], cert. denied 365 U.S. 824 [81 S.Ct. 703, 5 L.Ed.2d 702].)

The photographs were admitted in evidence during the testimony of William C. Bradley, Assistant Coroner of Marin County. People's Exhibit No. 27, to which defendants here make no objection is a photograph of the entire bound body of the victim as found lying on the floor of his apartment, with the bedspread which had covered it in a bundle in the background. People's Exhibits Nos. 28-31 show the body as found covered with the bedspread (No. 28) and close-ups

404

of the head covered with a towel (No. 29), the hands bound behind the back (No. 30) and the ankles taped (No. 31). The trial judge admitted them because of a difference of detail giving them probative value not outweighed in any of the pictures by their inflammatory nature.

People's Exhibits Nos. 32-34 showed the puncture wounds on the back (No. 32) and wounds on the head (Nos. 33 and 34). The court admitted No. 32 because it showed the manner in which the stab wounds were administered, thus giving it a probative value. After an examination of the remaining two, the court observed that "They do have probative value."

We have examined the photographs and cannot say that they are gruesome. Contrary to defendants' claims, the evidence was material. Since the photographs had probative value and, as the record reflects, the trial judge carefully weighed their probative value against any inflammatory effect they might have, we find no abuse of discretion in the admission of such evidence. (See *People* v. *Mathis, supra,* 63 Cal.2d 416, 423.)

People's Exhibits Nos. 36-38 were the victim's sweater, shirt and T-shirt. These also were admitted during Bradley's testimony. He testified that there were holes in the sweater and sixteen holes in the back of the shirt and in the T-shirt. The judge admitted the clothes as articles which the jury were entitled to consider. "[E]xcept in rare cases of abuse, demonstrative evidence that tends to prove a material issue or clarify the circumstances of the crime is admissible despite its prejudicial tendency. [Citations.]" (*People* v. *Adamson* (1946) 27 Cal.2d 478, 486 [165 P.2d 3], affirmed 332 U.S. 46 [67 S.Ct. 1672, 91 L.Ed. 1903, 171 A.L.R. 1223].) It has been held that clothing worn by the deceased at the time of the homicide is admissible in evidence as part of the res gestae, frequently tending to show the violence of the blow or the course or direction of the instrument of death. (*People* v. *Hong Ah Duck* (1882) 61 Cal. 387, 391;[16] *People* v. *Knapp* (1886) 71 Cal. 1, 3-4 [11 P. 793]; *People* v. *O'Brien* (1888) 78 Cal. 41, 44 [20 P. 359]; *People* v. *Haydon* (1912) 18 Cal.App. 543, 560 [123 P. 1102, 1114]; *People* v. *Bannon* (1922) 59 Cal.App. 50, 56 [209 P. 1029]; 4 Wigmore on Evidence (3d ed.) § 1157, pp. 254-257.) The evidence in question was relevant and material and had a clear probative value outweighing any prejudicial effect. The court's ruling was proper.

<hr>

[16]Overruled on other grounds in *People* v. *Bushton* (1889) 80 Cal. 160, 165 [22 P. 127, 549].

Defendant King contends that the court erred in admitting in evidence a part of his oral statement made to the arresting officers without admitting the entire statement. Initially the prosecution planned to introduce in their entirety statements made by King to two F.B.I. agents but, upon objection by counsel for Jones, the court excluded portions of the statements. Thus excluded were statements by King that he was afraid to give any information about Jones because the latter had tried to kill him on four occasions; that he met Jones (whom he knew only as Chuck Riggan) in a San Francisco bar and the latter, an exconvict, asked him to participate in a burglary in San Francisco; that Jones had given him the automatic which he had; that Jones had threatened to kill him; that he and Jones had a "lot of guns"; that Jones always complained about not getting enough for killing Corbett; and that Jones had killed several people "by contract."

The general rule that where part of a conversation has been shown in testimony, the remainder of that conversation may be brought out by the opposing party (Code Civ. Proc., § 1854; *Rosenberg* v. *Wittenborn* (1960) 178 Cal.App.2d 846, 852-853 [3 Cal.Rptr. 459] and authorities there collected; Witkin, Cal. Evidence (1958) p. 677; McCormick on Evidence, pp. 131-132; 20 Am.Jur., Evidence, § 551, pp. 463-464) is necessarily subject to the qualification that the court may exclude those portions of the conversation not relevant to the items thereof which have been introduced. (*Witt* v. *Jackson* (1961) 57 Cal.2d 57, 66-67 [17 Cal.Rptr. 369, 366 P.2d 641]; *People* v. *McCoy* (1944) 25 Cal.2d 177, 186-187 [153 P.2d 315]; *People* v. *Valles* (1961) 197 Cal.App.2d 362, 370-371 [17 Cal.Rptr. 204]; *People* v. *Kent* (1955) 135 Cal.App.2d 422, 428 [287 P.2d 402].) In *Valles, supra,* the court, quoting from *People* v. *Richards* (1946) 74 Cal.App.2d 279, 288 [168 P.2d 435], stated that what is meant by Code of Civil Procedure section 1854 is that "where part of a conversation . . . *material and relevant* to the issues of a case is given in evidence, the other parts of such conversation . . . having *relevant reference* to the part given may also be introduced." (197 Cal.App.2d at p. 370.) Defendant King does not point out to us how the excluded portion of his statement tended to explain or shed light on the portion admitted. Nor is it apparent to us how the matters excluded had " 'some bearing upon, or connection with, the admission

or declaration in evidence. . . .' '' (*Rosenberg* v. *Wittenborn, supra,* 178 Cal.App.2d 846, 852-853.)

But there is another basis upon which the court's ruling can be sustained. It is obvious that some of King's excluded statements implicated Jones in the murder and all of them were highly prejudicial to him since they portrayed him as a lawless person given to violence and murder. Had they been admitted even under careful instructions that they were hearsay as to Jones and could not be considered against him as a nondeclarant, there was an extreme likelihood that in view of the circumstances of the homicide the latter would have been prejudiced. The trial judge not only exercised a wise and sound discretion in rejecting evidence of questionable relevancy but at the same time preserved for Jones his right to a fair trial, unimpaired by borderline statements which the jury might have had difficulty in putting out of their minds. Indeed with remarkable foresight, the judge seems to have anticipated months beforehand the judicially declared rule in *People* v. *Aranda* (1965) 63 Cal.2d 518, 530 [47 Cal.Rptr. 353, 407 P.2d 265], approving the introduction in a joint trial of an extrajudicial statement of one defendant that implicates a codefendant only if all the implicating portions can be effectively deleted without prejudice to the declarant. We find no error in the court's ruling.

Finally both defendants complain that the prosecuting attorney committed prejudicial misconduct. We discuss the specifications in the order presented.

*First:* Defendants assert that the prosecutor continually made disparaging remarks about opposing counsel, citing nine instances.[17] In seven of the nine instances defendants properly preserved their right to raise the point on appeal. (See *People* v. *Ney* (1965) 238 Cal.App.2d 785, 790-791 [48 Cal.Rptr. 265] and cases there collected.) The Attorney General attempts to discount, if not negate, any impropriety in these remarks claiming that the prosecutor was merely objecting to the tactics of defense counsel and that,

---

[17]Four remarks occurred during the *voir dire* examination of the jury: "This is ridiculous"; "Mr. Smith has ranted . . . all afternoon"; "It obviously is a play to the gallery, Your Honor, and I don't appreciate this"; "He is trying to trick him into the answers." Three occurred during the prosecutor's opening statement: "I think this is highly rude for Counsel to interrupt this statement, Your Honor"; "can we avoid these technical interruptions, Your Honor? I know Mr. Smith's practice in the past; he does this purposely"; "Counsel is being ridiculous." Two occurred during the taking of testimony: "I don't understand that and I will object to it. This lingo, underworld, isn't proper here, Your Honor"; "counsel is apparently trying to trick the witness."

in effect, the blame ultimately rested upon the latter. We disagree. We have carefully examined the pertinent portions of the record and are satisfied that the prosecutor's remarks were uncalled for and in some of the instances improper. Even assuming that the prosecution was in good faith evincing objections to remarks of defense counsel, there were available to him the proper and customary methods of voicing such objections. Indeed apropos one of the incidents the court curbed the prosecutor observing ''that remark was unnecessary and borders very closely to misconduct.'' However it does not appear to us that the rights of defendants were prejudiced by the occurrences in question. In respect to four instances during *voir dire* examination, the court appears to have instructed the jury to disregard the remarks; in respect to the opening statement, the court admonished the prosecutor to refrain from argumentative remarks, apparently admonished him in respect to the remark that defense counsel was being ''ridiculous,'' but seems to have rejected any claim of misconduct in connection with the prosecutor's remark that defense counsel was purposely making ''technical interruptions''; as to the remarks during the testimony, the court took no action in one instance but in the other, although denying a motion for mistrial, instructed the jury to disregard it. All in all, we think the court assured defendants a fair trial unprejudiced by any improper remarks of the prosecutor. We conclude that no prejudicial error resulted. (*People* v. *Patterson* (1899) 124 Cal. 102, 104-105 [56 P. 882] ; *People* v. *McCracken* (1952) 39 Cal.2d 336, 348-349 [246 P.2d 913] ; cf. *People* v. *Podwys* (1935) 6 Cal.App.2d 71, 73-75 [44 P.2d 377].)

 *Second:* Defendants complain that, despite repeated warnings by the court, the prosecutor during his opening statement continually made references to the personality and life of the victim.[18]

Upon completion of the opening statement, proceedings were had outside the jury's presence during which the prosecutor sought to defend his above-mentioned statements on the grounds of relevancy. He proffered several theories, most of

---

[18]Examples of the complained-of remarks include: Corbett was the ''son of a prominent doctor''; ''educated at Yale University''; ''that he was an Air Force captain''; ''that he received an Easter card . . . from his daughter''; ''that he was of impeccable moral character and a deeply religious person''; ''with quite a life expectancy and with a promising future ahead of him.''

which seem to have been rejected by the trial judge who stated: ''I confess that I had very serious misgivings about the type of opening statement you made. . . . But it is certainly not proper to place before the jury matters in the opening statement that are not going to be part of the evidence. And I have yet to hear from you any theory upon which the evidence of the deceased's good character can properly go before this jury.''[19]

The court thereupon denied the motion for mistrial ''at the present time'' ordering that there was to be no further reference, either by way of argument or evidence, to the victim's good character ''excluding those traits of character which were mentioned in the opening statement relating to the deceased's habits, if it is otherwise admissible, in seeking companionship which might have some bearing on the case.''

We said in *People* v. *Nelson* (1964) 224 Cal.App.2d 238, 252-253 [36 Cal.Rptr. 385] : ''The rule is that in an opening statement it is the duty of counsel to state the facts fairly and to refrain from referring to facts which he cannot or *will not be permitted to prove*. [Citations.] In a criminal case, the sole purpose of an opening statement by the People is to outline what the prosecution intends to prove, . . . . Subsequent failure of the prosecutor to secure the introduction into evidence of what he claimed he would prove does not necessarily indicate prejudice particularly in the absence of a showing of bad faith. [Citations.]'' (Italics added.)

We have difficulty in determining whether there was a showing of bad faith. While the record reflects the prosecutor's insistence that all of the statements were relevant, it also indicates the court's belief that the prosecutor well knew the limits of a permissible statement. (See fn. 17, *ante*.) On the other hand, as we have pointed out, the court did permit future reference to some of the victim's habits and to that extent approved of the prosecutor's reference to them in the opening statement. Furthermore, the court denied the motion for a mistrial. Under all the circumstances we are not constrained to conclude that the statements were made in

---

[19]The court continued: ''Mr. Bales [District Attorney], it is the rule and it is elementary law, and you know it, that the evidence of the character of the victim is not admissible except in special circumstances where self defense is in issue, or possible suicide, to show his frame of mind on this question. This is elementary law, and you know it. And you went ahead and deliberately addressed that jury on the character of the deceased. You know this is not a suicide defense. You know there is no suggestion of self defense. I know of no case that would permit character evidence on this question.''

bad faith; even assuming that there was misconduct, we are of the view that it was not prejudicial.

 ■ *Third:* Defendant King alone claims that the prosecutor's cross-examination of King's sole witness Renneckar was improper. King states that, after questioning the witness at length about a statement made by him to the district attorney's chief investigator, the prosecutor asked: "At the conclusion of all of the matters did Mr. Midyett tell you he didn't believe you?" The record reflects that this question was asked *not* by the prosecutor but by counsel for defendant Jones on recross-examination. King further complains that the prosecutor then called Thomas B. Reagan[20] who was present during a conversation in which Renneckar described what he observed on Good Friday evening and inquired about Renneckar's statements at the time. The following then occurred: "Q. [By the district attorney] Did you believe him? MR. SMITH [Counsel for defendant King] : Object. Pardon me. THE COURT: Sustained. Sustained. You know better. MR. SMITH: He learned that in law school on his first day, Judge, I think. Q. (By Mr. Bales) Did you think he was making it up? MR. SMITH: Object. Pardon me, Your Honor, may we have a motion to cite brother Bales for prejudicial misconduct and the jury admonished to disregard it? THE COURT: Sustained, Mr. Bales. The jury is admonished to disregard both questions and any suggestions contained in the questions." The questions were improper but the jury were promptly admonished and we must assume that they heeded the admonition. (*People* v. *Ney, supra,* 238 Cal.App.2d 785, 801; *People* v. *Black* (1941) 45 Cal.App.2d 87, 98 [113 P.2d 746].) We feel that any harmful effects of the incident were thereby obviated.

The attempted appeal by defendant King from the order denying his motion for a new trial is dismissed. The judgments are affirmed.

Molinari, J., and Draper, J.,* concurred.

Appellants' petitions for a hearing by the Supreme Court were denied April 22, 1966.

---

[20]King erroneously states in his brief that the witness called was Midyett, the district attorney's investigator.

*Assigned by the Chairman of the Judicial Council.